**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| THE YORK GROUP, INC., MILSO INDUSTRIES CORPORATION, and MATTHEWS INTERNATIONAL CORPORATION, | ) ) ) ) ) |  |
| Plaintiffs, | ) ) | 2:10-cv-01078-ECF |
| v. | ) ) | Hon. Joy Flowers Conti |
| SCOTT PONTONE, HARRY PONTONE, PONTONE CASKET COMPANY, LLC and BATESVILLE CASKET COMPANY, INC. | ) ) ) ) |  |
| Defendants. | ) |  |

## MEMORANDUM OPINION AND ORDER

CONTI, District Judge

### I.  Introduction

Pending before the court is the motion to dismiss plaintiffs' amended complaint for lack of subject-matter jurisdiction filed by defendants Scott Pontone, Harry Pontone, and Pontone Casket Company, LLC ("Pontone Casket" and together with Scott Pontone and Harry Pontone, the "Pontone defendants") and joined by defendant Batesville Casket Company, Inc. ("Batesville"). (ECF Nos. 182, 187.) On August 16, 2010, plaintiffs Matthews International Corporation ("Matthews"), The York Group ("York Group"), and Milso Industries Corporation ("Milso") filed a complaint against defendants Scott Pontone and Batesville for alleged violations of state laws related to wrongful solicitation of plaintiffs' employees and customers. (ECF No. 1.)  On September 10, 2010, those defendants filed an answer to the complaint. (ECF No. 25.) On February 28, 2011, plaintiffs filed an amended complaint, which included Harry

Pontone and Pontone Casket as defendants. (ECF No. 70.)

Plaintiffs alleged that the court has jurisdiction over the case under 28 U.S.C. §1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000. (ECF No. 70, ¶13.) The amended complaint set forth the diversity of citizenship between the parties as follows: plaintiffs are each incorporated under the laws of either Delaware or Pennsylvania with their principal places of business in Pittsburgh, Pennsylvania; defendants Scott Pontone and Harry Pontone are citizens of New York; Batesville is an Indiana corporation with its principal place of business in Batesville, Indiana; and Pontone Casket is a New York corporation with its principal place of business in New York. (Id. at ¶¶ 6-12.)

On December 14, 2011, Milso served Pontone Casket with answers to its First Discovery Requests. (ECF No. 183-1.) In answers to interrogatories #3 and #4 of that request, Milso stated its principal place of business was Brooklyn, New York, and that its principal place of business had not changed since 2005. (ECF No. 183-1 at 5.) On December 15, 2011, the Pontone defendants filed a motion to dismiss for lack of subject-matter jurisdiction, arguing that based on Milso's answer to interrogatories #3 and #4, Milso's principal place of business was Brooklyn, New York, and therefore, there was not complete diversity between the parties. (ECF No. 183.) Batesville joined the Pontone defendants' motion to dismiss on December 22, 2011. (ECF No. 187.)

On December 19, 2011, Milso amended its response to Pontone Casket's discovery requests. (ECF No. 191-5.) In amended answer to interrogatory #3, Milso stated "[a]t all relevant times, [Milso's] legal principal place of business . . . has been at Two NorthShore Center, Pittsburgh, Pennsylvania 15212." (ECF No. 191-5 at 5.) In amended answer to interrogatory #4,

Milso claimed that its principal place of business "under applicable law is and has been Two NorthShore Center, Pittsburgh, Pennsylvania 15212, the place from which [Milso's] officers direct, control and coordinate [Milso's] activities." (Id.) On January 5, 2012, plaintiffs filed a memorandum of law in opposition to the Pontone defendants' motion to dismiss. The memorandum alleged that from August 2008 through August 2010 (the "relevant time period") when the initial complaint was filed, Milso's major decision-making took place in Pittsburgh, Pennsylvania, and all its officers and directors, with the exception of Harry Pontone, worked in offices located in Pittsburgh, Pennsylvania. (ECF 191 at 9-10.) On February 1, 2012, the Pontone defendants filed a reply memorandum in further support of their motion to dismiss for lack of subject-matter jurisdiction. (ECF No. 200.) The memorandum alleged that the place of business of a wholly-owned subsidiary must be determined independently of its corporate parents, and that facts demonstrate that during the relevant time period, Milso's principal place of business was Brooklyn, New York. (Id. at 9.)

During a February 3, 2012 hearing with respect to the Pontone defendants' motion to dismiss, the court held that plaintiffs' first responses to interrogatories #3 and #4 were evidentiary admissions and not judicial admissions. (ECF. 202 at 9-13 (citing 30B CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 726, 328-31 (2011 Interim ed.); Airco Indus. Gases, Inc. Div. of the BOC Group, Inc. v. Teamsters Health and Welfare Pension Plan, 850 F.2d 1028 (3d Cir. 1988.)) The court found that in light of plaintiffs' amended answer, an evidentiary hearing was proper to determine whether the court had subject-matter jurisdiction over the case. (ECF No. 202 at 12-13.) The court permitted the parties to conduct discovery relating specifically to the issue of subject-matter jurisdiction. (ECF No. 202.) Among other things, the court commented that discovery should focus on where the high officers

of Milso are located and where they perform their functions as officers. (ECF No. 202 at 42.)
From March 12-14, 2012, three Milso officers, Joseph C. Bartolacci ("Bartolacci"), Steven F.
Nicola ("Nicola"), and James P. Doyle ("Doyle"), were deposed in order to discern their roles
and duties within Milso, and the location from which they performed those duties during the
relevant time period. (ECF Nos. 225, 226, 228, 229, 230.) Andrew Pontone, Milso's northeast
regional sales manager, and Brian Walters ("Walters"), vice president and general counsel of
Matthews who answered defendants' interrogatories on behalf of the plaintiffs, were also
deposed during this time. (ECF Nos. 227, 231.)

On March 16, 2012, the court held an evidentiary hearing with respect to subject-matter
jurisdiction over the case. Bartolacci, Nicola, and Walters testified. The court left the record open
for the parties to introduce the relevant portions of the depositions of Bartolacci, Nicola, Doyle,
Andrew Pontone, and Walters into evidence. On April 12, 2012, both parties filed proposed
findings of fact and conclusions of law. (ECF No. 221, 222.) On April 13, 2012, the Pontone
defendants filed the depositions of Bartolacci, Nicola, Doyle, Andrew Pontone, and Walters in
their entirety with the court. The issue whether the court has subject-matter jurisdiction over this
case is now ripe to be decided by the court.

## I. Findings of Fact

### The Acquisition

1.      On May 28, 2005, Midnight Acquisition Corporation ("Midnight"), a wholly
owned subsidiary of York Group, acquired the assets of a Brooklyn, New York-based casket
manufacturing and distribution business, Old Milso, for $110 million pursuant to an Asset
Purchase Agreement (the "Agreement"). (3/16/2012 Tr at 13, 14, 22; Defs.' Ex. F (¶ 8); (ECF
No. 4-1.))

2.      Under the Agreement, Midnight acquired Old Milso's assets, including the Milso name, inventory, receivables, manufacturing equipment, delivery trucks, customer relationships, and goodwill. (3/16/2012 Tr. at14.)

3.      On July 11, 2005, Midnight's name was changed to Milso Industries Corporation. (Id.)

4.      York Group's headquarters is located at Two NorthShore Center, Pittsburgh, Pennsylvania. (ECF No. 211-1 (YORK-442560, YORK-442562,YORK-442564.))

5.      York Group is a wholly-owned subsidiary of Matthews. (3/16/2012 Tr. at 14.)

6.      Matthews' headquarters is located at Two NorthShore Center, Pittsburgh, Pennsylvania. (Defs.' Exs. D, E, G (¶ 2.))

7.      Matthews is a corporation organized into two business segments: the "Memorialization" business segment and the "Brand Solutions" business segment. (3/16/2012 Tr. at12.) The "Memorialization" business segment is divided into three divisions: the Casket Division, the Bronze Division, and the Cremation Division. Id. Milso is a part of the Casket Division of Matthews. Id.

8.      Milso's officers following the acquisition were: David Kelly, chairman; Harry Pontone, president; Scott Pontone, vice president; Bartolacci, vice-president; Nicola, vice-president, secretary, and treasurer; and David DeCarlo, vice-president. (3/16/2012 Tr. at 80; Defs.' Ex. C (YORK-04272576-78.))

9.      Until 2007, Harry Pontone, Scott Pontone, and other members of the Pontone family managed the day-to-day operations of Milso from an office located in Brooklyn, New York, referred to as "Milso Headquarters," which employed among others, payroll personnel, receivable clerks, and customer service representatives. (3/16/2012 Tr. at 22-23.)

10.     By 2007, Milso's performance began to deteriorate. As a result, York Group began to exercise more control over Milso under its strategic decision-making authority. (Id.)

11.     On March 30, 2007, Scott Pontone and Harry Pontone filed a lawsuit against York Group, claiming that York Group's management and increasing control of Milso was in violation of their employment agreements. (3/16/2012 Tr. at 22; (ECF No. 191-2.))

12.     In May 2007, the lawsuit was settled. Under the terms of the settlement, Scott Pontone resigned his positions as vice president and director of Milso, and Harry Pontone resigned as president of Milso, but remained a member of Milso's board of directors. (3/16/2012 Tr. at 23; Defs.' Ex. F (¶ 14.))

## Milso's Operations After the 2007 Lawsuit

13.     Following the settlement, operations of Milso were moved to Two NorthShore Center, Pittsburgh, Pennsylvania. All the remaining officers were also officers of related companies, such as Matthews and York Group. Their offices were maintained in Pittsburgh, Pennsylvania. At that time, the only named officers of Milso were Bartolacci, vice president, Nicola, vice president, secretary, and treasurer, and DeCarlo, vice president. All Milso's administrative offices, including information technology, financial reporting, customer services, human resources, account receivables, and legal functions were relocated to that location. (3/16/2012 Tr. at 23, 24; Defs.' Ex. F (¶¶ 14-16.))

14.     After 2008, Milso's office in Brooklyn, New York became a regional office used for marketing and meetings with customers from the New York area. (3/16/2012 Tr. at 23.)

15.     During the relevant time period, Milso was engaged in the business of manufacturing, selling, and distributing caskets and had customers and inventory throughout the northeast United States, Ohio, Indiana, and Texas, with a large concentration of business in New

York. (Id. at 15, 53; Pls.' Ex. 8; Defs.' Ex. H (YORK-472881.))

16.     Milso has administrative offices located in Pittsburgh, Pennsylvania, a manufacturing facility located in Richmond, Indiana, and distribution centers and salespeople located throughout the United States, including Brooklyn, New York. (3/16/2012 Tr. at 15, 16, 53-54, 65-72,119-20, 122-23, 129-30, 189.)

17.     Milso's revenue was in excess of $100 million during the relevant time period. (Id. at 15, 142.)

18.     Matthews provided administrative services to Milso from its location at Two NorthShore Center, Pittsburgh, Pennsylvania, during the relevant time period. These services included: information technology, tax return preparation, credit and collections, accounts payable, and human resources. Milso paid for these services through inter-corporate charges. (Id. at 142-43.)

**Milso's Officers, Directors, and Executive Committee**

19.     On April 18, 2007, Milso's board of directors formed an executive committee invested with the responsibility of developing Milso's strategic business plan, with the exception of any strategic plan agreed to by the board of directors as a whole. The executive committee's meetings were to take place in Pittsburgh, Pennsylvania. There were three members of Milso's executive committee: Bartolacci, Harry Pontone, and David DeCarlo. Bartolacci and David DeCarlo worked from Two NorthShore Center, Pittsburgh Pennsylvania, and Harry Pontone worked in Brooklyn, New York. (3/16/2012 Tr. at 88-89; Defendants' Ex. "C" (YORK 472586-88.))

20.     David DeCarlo retired from his positions as vice president of Milso and a member of Milso's executive committee some time in 2008. (3/16/2012 Tr. at 89; Defs.' Demons. iii;

159; S. Nicola Tr. at 28; B. Walters Tr. at 142.)

21. The executive committee was never formally abolished, but its members did not meet as an executive committee following the settlement of the 2007 lawsuit. (3/16/2012 Tr. at 89-90.)

22. During the relevant time period, Milso had four officers and five members of the board of directors. The four officers, who also served as directors, were Bartolacci, Nicola, Doyle, and Beck (the "officers".) Harry Pontone was a member of the board of directors, but did not serve as an officer of Milso. (Id. at 17-18, 103-04.)

### a. **Joseph Bartolacci**

23. Bartolacci served as the president and chief executive officer of Matthews, and acting president and chief executive officer of Milso during the relevant time period. (3/16/2012 Tr. at 9.)

24. There is no formal documentation of Bartolacci being elected president in Milso's corporate minute book. (3/16/2012 Tr. at 109.)

25. Section 3.05 of Milso's bylaws provides, "[a]t the request of the President or in his absence or disability, the senior Vice President shall exercise all the powers and duties of the President." (Defs.' Ex."D," § 305 (YORK-0457996.))

26. Bartolacci was elected as a vice president of Milso by means of a unanimous written consent on July 11, 2005. (3/16/2012 Tr. at 80; Defs.' Ex. "C" (YORK 472576-78).

27. Following Harry Pontone's resignation as president of Milso on May 30, 2007, Bartolacci acted as president of Milso. (3/16/2012 Tr. at 109-10, 125.)

28. Throughout the relevant time period, Bartolacci delegated responsibilities to his fellow officers as president of Milso, and Milso's officers and employees regarded Bartolacci as

president. (Id. at 112, 135, 146, 163, 178.)

29.     As Milso's acting president, Bartolacci maintained daily contact with Milso's officers, received daily financial reports, reviewed possible acquisitions, approved pricing, and set discount parameters specifically for Milso. (Id. at 27, 28, 34-35.)

30.     Bartolacci participated in the Matthews' Casket Division's annual business review, strategic plan, and budget formation, which included the review of specific figures from Milso. (Id. at 27-28.)

31.     Bartolacci had the ultimate authority to hire Milso employees, and he led the interview process for Milso, which included negotiating and extending offers to potential employees. (Id. at 38.)

32.     Bartolacci worked from Two North Shore Center, Pittsburgh, Pennsylvania during the relevant time period. (3/16/2012 Tr. at 18.)

### b.     Steven Nicola

33.     Nicola served as chief financial officer, secretary, and treasurer of Matthews, and a vice president, secretary, and a director of Milso during the relevant time period. (3/16/2012 Tr. pp at 17, 135, 172-73.)

34.     Nicola was elected vice president, secretary, and treasurer of Milso by means of a unanimous written consent on July 11, 2005. (3/16/2012 Tr. at 80, 135-36, 172-73; Defs.' Ex. "C" (YORK 472576-78.))

35.     Although elected to the position on July 11, 2005, Nicola did not recall acting as treasurer of Milso during the relevant time period. (3/16/2012 Tr. at 174.)

36.     Nicola reported directly to Bartolacci. (Id. at 25, 135.)

37.     Nicola was responsible for Milso's collections, receivables, payables,

management and utilization of assets, contract approval, expenditures, insurance, filing of tax returns, and corporate registrations and filings. (Id. at 25.)

38.     Nicola was responsible for Milso's financial reporting, including the preparation of daily sales reports and monthly financial statements. (3/16/2012 Tr. at 25, 136, 148-49.)

39.     Nicola was responsible for preparing and maintaining Milso's corporate books and records, which included Milso's resolutions and board meeting minutes. (3/16/2012 Tr. at 143-44, 155.)

40.     Nicola worked from Two North Shore Center, Pittsburgh, Pennsylvania during the relevant time period. (3/16/2012 Tr. at 19, 135.)

### c.     **James Doyle**

41.     Doyle served as president of Matthews' Memorialization Group and a director of Milso during the relevant time period. (Id. at 17; (J. Doyle Tr. at 115.))

42.     There is no formal documentation of Doyle's election as a vice president of Milso in Milso's corporate minute book. (3/16/2012 Tr. at 108.)

43.     Doyle, however, performed the tasks of a vice president, and his fellow officers regarded him as a vice president of Milso during the relevant time period. (Id.)

44.     Doyle was responsible for the day-to-day operations of Milso and York Group, including the day-to-day operations that took place in Brooklyn, New York. (3/16/2012 Tr. at 20, 25-26.)

45.     Doyle was responsible for Milso's sales and distribution of product. (Id. at 54.)

46.     Manufacturing, accounting, sales, and distribution managers reported directly to Doyle, who reported directly to Bartolacci, during the relevant time period. (Id. at 26.)

47.     Doyle worked from Two North Shore Center, Pittsburgh, Pennsylvania during the

relevant time period. (3/16/2012 Tr. at 18-19; (J. Doyle Tr. at 115.))

### d.    **David Beck**

48.    Beck served as the controller of Matthews and a director of Milso during the relevant time period. (3/16/2012 Tr. at 17.)

49.    There is no formal documentation of Beck's election as the treasurer of Milso in the corporate minute book. Nicola, who was formally elected as the treasurer in 2005, however, does not recall acting as the treasurer of Milso during the relevant time period. (Id. at 111, 174.)

50.    Beck performed the tasks of the treasurer during the relevant time period, and his fellow officers regarded him as the treasurer of Milso. (3/16/2012 Tr. at 61.)

51.    Beck reported directly to Nicola, and prepared Milso's corporate registrations and filings. (Id. at 26, 147.)

52.    Beck worked from Two North Shore Center, Pittsburgh, Pennsylvania during the relevant time period. (3/16/2012 Tr. at 19.)

### e.    **Harry Pontone**

53.    During the relevant time period, Harry Pontone served as a director of Milso until his departure from Matthews in the summer of 2010. (Id. at 46.)

54.    His responsibilities included maintaining goodwill and relationships with customers in the New York area during the relevant time period. (Id. at 18.)

55.    Harry Pontone worked out of Milso's Brooklyn, New York office during the relevant time period. (3/16/2012 Tr. at 19; Defs.' Ex. F (¶ 2.))

### **Andrew Pontone**

56.    Andrew Pontone was a regional sales manager for the northeast region, and was responsible for managing sales functions and salespeople for Milso in the northeast during the

relevant time period. (Id. at 72-73; A. Pontone Tr. at 78.)

57.     Andrew Pontone was the highest ranking person based out of Milso's Brooklyn, New York office, and was engaged in the sales and distribution of caskets during the relevant time period. (A. Pontone Tr. at 81, 95.)

58.     Andrew Pontone participated in Milso's strategic planning meetings in Pittsburgh, Pennsylvania, but did not have responsibility for Milso's strategic direction, budgets, acquisitions, capital expenditures, or significant employment matters during the relevant time period. (Id. at 95-98; (J. Doyle Tr. at 115.))

### Brian Walters

59.     Walters served as a vice president and general counsel of Matthews during the relevant time period. (3/16/2012 Tr. at 175.)

60.     Walters provided legal advice to Milso's officers with respect to acquisitions, distribution strategies, employment agreements, non-competition covenants, and Milso's various leases throughout the country during the relevant time period. (Id. at 176-77, 178.)

61.     Walters worked out of Two NorthShore Center, Pittsburgh, Pennsylvania throughout the relevant time period. (Id.)

### The Direction and Control of Milso

62.     The high level officers of Milso during the relevant time period were: Bartolacci, acting president; Nicola, vice-president and secretary; Doyle, acting vice-president; and Beck, acting treasurer. (3/16/2012 Tr. at 9, 17, 135, 172-73.)

63.     The high level officers directed, controlled, and coordinated Milso's activities from Two NorthShore Center, Pittsburgh, Pennsylvania during the relevant time period. (Id. at 20, 21, 24-25, 27-28, 37-38, 96, 143-44, 137-42, 149, 154-55.) No high level officer was located

in Brooklyn, New York during the relevant time period.

64.     The high level officers' duties as officers of Milso often overlapped with their duties as officers and directors of Matthews and Matthews' other corporations. Milso, however, had its own customers, products, and strategies during the relevant time period. (Id. at 20.)

65.     There is no documentation of any formal board meeting or action taken by Milso's board of directors during the relevant time period. (Id. at 96.)

66.     Milso's high level officers, who were also members of Milso's board of directors, however, met regularly during the relevant time period at Two North Shore Center, in Pittsburgh, Pennsylvania. (3/16/2012 Tr. at 17, 96.)

67.     Milso's high level officers were involved in Milso's operations on a daily basis during the relevant time period. (Id. at 20, 21, 96.)

68.     Milso's corporate records, including its certificate of incorporation, by-laws, board of directors' meeting minutes, board consents, board resolutions, and corporate filings were maintained by Nicola at Two North Shore Center, Pittsburgh, Pennsylvania throughout the relevant time period. (3/16/2012 Tr. at 143-44, 155.)

69.     Milso's high level officers made decisions with respect to the corporation's financial operations, potential acquisitions, budget, employees, and strategic plan from Two North Shore Center, Pittsburgh, Pennsylvania during the relevant time period. (Id. at 27-28, 37-38, 154-55.)

70.     The high level officers prepared and maintained separate financial reports for Milso during the relevant time period. These financial reports were incorporated into the financial reports for the Casket Division of Matthews, and ultimately, into the consolidated financial reports for Matthews and its subsidiaries. (3/16/2012 Tr. at 137-142; Defs. Ex. G (¶

11).)

71.     Throughout the relevant time period, the high level officers prepared and maintained a separate budget for Milso. This budget was incorporated into the budget for Matthews' Casket Division. (3/16/2012 Tr. at 28-29, 129, 137-38, 151-54, 165.)

72.     The high level officers' salaries were paid by Matthews, which allocated the cost of the salaries to the subsidiaries (including Milso) through inter-corporate charges during the relevant time period. (Id. at 23.)

73.     Only high level officers located in Pittsburgh, Pennsylvania developed strategic plans, made decisions on acquisitions, set the budget, and made key employment decisions for Milso throughout the relevant time period. (Id. at 124.)

## II. Conclusions of Law

1.     The burden of establishing jurisdiction in the district court lies with the party seeking to invoke the court's jurisdiction. KVOS, Inc. v. Associated Press, 299 U.S. 269, 278 (1936); see Carpet Group Intern. v. Oriental Rug Importers Ass'n, Inc., 227 F.3d 62, 69 (3d Cir. 2000); see also Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).

2.     If a Rule 12(b)(1) motion challenges the court's subject-matter jurisdiction based on the sufficiency of the pleading's allegations, i.e., the movant presents a "facial" attack on the pleading, then those allegations are taken as true and construed in a light most favorable to the complainant. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (case dismissed upon facial attack on complaint, without consideration of extrinsic evidence); Cedars-Sinai Med. Cntr. v. Watkins, 11 F.3d 1573, 1583 (Fed. Cir. 1993); 2A JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 12.07[2.-1], at 12-51 to 52 (1993).

3.     If the Rule 12(b)(1) motion denies or controverts the pleader's allegations of

jurisdiction, however, the movant is deemed to be challenging the factual basis for the court's subject-matter jurisdiction. See Watkins, 11 F.3d at 1583-84 (citing Trentacosta v. Frontier Pac. Aircraft Indus., Inc., 813 F.2d 1553, 1558-59 (9th Cir. 1987)); 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1363, at 456-57 (1990)). In such a case, the allegations in the complaint are not controlling, KVOS, 299 U.S. at 277-79; Trentacosta, 813 F.2d at 1559; Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp., 594 F.2d 730, 733 (9th Cir. 1979); 5A WRIGHT & MILLER, supra, § 1363, at 457-58, and only uncontroverted factual allegations are accepted as true for purposes of the motion. See Gibbs v. Buck, 307 U.S. 66, 72 (1939); Watkins, 11 F.3d at 1583-84; 5A WRIGHT & MILLER, supra, §§ 1350, 1363, at 219-20, 457. All other facts underlying the controverted jurisdictional allegations are in dispute and are subject to fact finding by the district court. Watkins, 11 F.3d at 1583-84; 2A MOORE ET AL., supra, ¶ 12.07 [2.-1],at 12-52; see generally Ohio Nat'l Life Ins. Co. v. U.S., 922 F.2d 320, 325 (6th Cir. 1990) (drawing distinction between facial and factual challenges to court's subject-matter jurisdiction); Mortensen v. First Fed. Savs. & Loan Ass'n, 549 F.2d 884, 891-92 (3d Cir. 1977).

    4.    In establishing the predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including affidavits and deposition testimony. Land v. Dollar, 330 U.S. 731,735 n.4 (1947); Watkins, 11 F.3d at 1584; St. Clair v. City of Chi., 880 F.2d 199, 201 (9th Cir. 1989) (court properly considered materials outside pleadings to determine whether plaintiff's claim was ripe), cert. denied, 493 U.S. 993 (1989); Reynolds, 846 F.2d at 747; Indium Corp. of Am. v. Semi-Alloys, Inc., 781 F.2d 879 cert. denied, 479 U.S. 820 (1986).

    5.    District courts "have original jurisdiction of all civil actions where the matter in

controversy exceeds the sum or value of $75,000, exclusive of interest, and is between …

citizens of different States." 28 U.S.C. § 1332(a). Complete diversity requires that, in cases with

multiple plaintiffs or multiple defendants, no plaintiff be a citizen of the same state as any

defendant. See e.g., Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 419 (3d Cir. 2010).

The key inquiry in such a matter turns upon the citizenship of each party to the action. See

Zambelli Fireworks, 592 F.3d at 419; Laufen Intern., Inc. v. Larry J. Lint Floor & Wall

Covering, Co., Inc., No. 10-cv-199, 2010 WL 1444869, at *2 (W.D. Pa. Apr. 9, 2010).

6.      For purposes of diversity jurisdiction, the party asserting diversity of citizenship

bears the burden of proof. Hertz Corp. v. Friend, 130 S. Ct. 1181, 1194 (2010). "A party

generally meets this burden by proving diversity of citizenship by a preponderance of the

evidence." McCann v. Newman Irrevocable Trust, 458 F.3d 281, 286 (3d Cir. 2006) (citing

McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); see Hertz, 130 S. Ct. at

1194-95 (parties must support their jurisdictional allegations by competent proof).

7.      Diversity jurisdiction is determined by "examining the citizenship of the parties at

the time the complaint was filed." Midlantic Nat. Bank v. Hansen, 48 F.3d 693, 696 (3d Cir.

1995); see Smith v. Sperling, 354 U.S. 91, 93 n. 1 (1957) (jurisdiction depends on the state of

things at the time the action was brought). A corporation is deemed to be citizen of the state in

which it is incorporated, and the state where it has its principal place of business. 28 U.S.C. §

1332(c)(1).

8.      The Supreme Court of the United States set forth a clear test for determining

corporate citizenship in Hertz, 130 S. Ct. at 1192. The Hertz decision was a response to the

"divergent and increasingly complex interpretations" of corporate citizenship that had developed

among the courts of appeals. Id. The Supreme Court laid out the corporate citizenship test as

follows:

> We conclude that "principal place of business" is best read as referring to the place **where a corporation's officers direct, control, and coordinate the corporation's activities**. It is the place that Courts of Appeals have called the corporation's "nerve center." And in practice it should normally be the place where the corporation maintains its headquarters – provided that the headquarters is the actual center of direction, control, and coordination, *i.e.*, the "nerve center," and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion).

Hertz, 130 S. Ct. at 1192 (emphasis added).

9.      In Hertz, citizens of California (the "citizens") sued the Hertz Corporation ("Hertz") in a California state court for violations of state law. Hertz, 130 S. Ct. at 1183. Hertz attempted to remove the case to federal district court asserting diversity of citizenship between the parties. The citizens objected, however, and argued that diversity jurisdiction was lacking because Hertz's principal place of business was in California. The citizens argued that the majority of Hertz's business came from its California facility, even though its executive facilities were located in New Jersey and the corporation operated in forty-three other states. Id. Applying precedent of the Court of Appeals for the Ninth Circuit for determining a corporation's citizenship, the federal district court examined whether the corporation's business activities were "significantly larger" or "substantially predominate" in a certain state. Id. The district court found that Hertz was a citizen of California because the majority of its business took place in that state and held that complete diversity of citizenship was lacking between the parties. Id. The Court of Appeals for the Ninth Circuit affirmed. Id. On appeal, the Supreme Court rejected the Court of Appeals for the Ninth Circuit's test and held that the principal place of business for purposes of diversity jurisdiction "refers to the place where the corporation's high level officers

direct, control, and coordinate the corporation's activities." Hertz, 130 S. Ct. at 1186. The Court reversed the decision and found the location of Hertz's "nerve center" was New Jersey because its executive and administrative offices were located that state. Id. at 1195.

10. Defendants argue that Hertz does not address the principal place of business for subsidiary corporations and that the Supreme Court "'left entirely undisturbed the long-standing rule'" that "'a subsidiary corporation which is incorporated as a separate entity from its parent corporation is considered to have its own principal place of business when determining diversity jurisdiction.'" (ECF No. 200 at 9-10) (quoting Destech Publications, Inc. v. Port City Press, Inc., No. 11-5461, 2011 WL 6009985, at *2 (E.D. Pa. Dec. 1, 2011)). Defendants contend that Milso, a separately incorporated subsidiary of Matthews and York Group, requires an independent analysis of its principal place of business for diversity purposes. (ECF No. 222 at 21.)

11. Defendants rely on Topp v. CompAir, Inc., 814 F.2d 830 (1st Cir. 1995), which predates Hertz. In Topp, the Court of Appeals for the First Circuit explained that the inquiry of the nerve center test "must be limited to an examination of the subsidiary's own activities, officers, and facilities" and that the test "does not grant free license to ignore the separate corporate identity of the corporation whose citizenship is being sought." Topp, 814 F.2d at 835. The Court of Appeals for the First Circuit clearly stated in Topp, however, that it would *not* be incorrect to find a subsidiary's principal place of business was the same place as its parent company if its "officers who normally managed the corporation, and the other indices of management, such as corporate books and minutes, the entity's secretariat, employees, bank accounts, and tax filings" are mainly centered in the same location as the parent corporation. Id. This implication, that the nerve center of a subsidiary could be located in the same place as its parent corporation, is consistent with the Supreme Court's rationale in Hertz and the Topp

rationale regarding subsidiaries is not distinct from <u>Hertz</u> as defendants suggest. (<u>See</u> ECF No. 200 at 15-16; see ECF No. 222 at 21-22.)

12.     This court agrees with defendants that a separate inquiry must be made with respect to a subsidiary's citizenship and that it would be improper, even under <u>Hertz</u>, to find a subsidiary's citizenship *ipso facto* is the same as its parent's citizenship. Notwithstanding that assessment, it also is not required that a court *must* find a subsidiary's principal place of business to be different from that of its parent's principal place of business.

13.     Under <u>Hertz</u>, Milso's principal place of business is Pittsburgh, Pennsylvania. All of Milso's high level officers, Bartolacci, Nicola, Doyle, and Beck, actually directed and controlled Milso from their offices at Two NorthShore Center, Pittsburgh, Pennsylvania, during the relevant time period. The officers interacted on a daily basis to review and discuss Milso's performance and to make decisions with respect to Milso's budget, possible acquisitions, strategic plan, and key employment issues. There is no evidence that anyone working from Brooklyn, New York during the relevant time period had the power to direct, control, or coordinate Milso's corporate activities. All the administrative functions of Milso that had been performed in Brooklyn, New York prior to 2007 were performed in Pittsburgh, Pennsylvania following the settlement of the 2007 lawsuit when Harry Pontone and Scott Pontone resigned as officers of Milso. While Harry Pontone may have had certain authority to direct or control Milso as a director of the corporation and member of the executive committee, there is no evidence he exercised that authority and actually directed activities of Milso during the relevant time period. It is not sufficient that Andrew Pontone managed day-to-day product distribution from Brooklyn, New York during the relevant time period. The determination the court must make is who was *actually* exercising the authority to direct or control the corporation during the relevant time

period. The court finds the high level officers located in Pittsburgh, Pennsylvania actually exercised that authority, and thus, the nerve center for Milso and its principal place of business is Pittsburgh, Pennsylvania. The court's holding has little to do with where Milso's corporate parents, Matthews and York Group, operated, and instead, is based upon an independent analysis of where the individuals responsible for Milso's corporate control conducted the business and activities of Milso. While those Milso officers were also employed by other Matthews' entities, they were the only Milso officers who actually directed and controlled Milso during the relevant time period.

14.     Defendants rely on several decisions following Hertz in order to support their argument that Milso, as a subsidiary of Matthews and York Group, should be found to have a principal place of business separate from its corporate parents' principal place of business. Plaintiffs correctly point out, however, that the decisions cited by Milso are distinguishable from the case at hand. (ECF No. 221 at 34.) The recent decisions cited by defendants involve subsidiaries that either had officers who were not officers of the parent corporation or the officers who worked from the parent corporation's headquarters did not exercise any direction or control over the subsidiary.

15.     Defendants rely on EverNu Tech LLC v. Rohm & Haas Co., No. 10-2635, 2010 WL 3419892 (E.D. Pa. Aug. 26, 2010), to support their argument that Milso did not share its parent corporations' principal places of business during the relevant time period. (ECF No. 222 at 22.) In EverNu Tech, the court found the subsidiary of a Michigan corporation had its principal place of business in Pennsylvania because the subsidiary operated autonomously from its parent and the subsidiary had separate officers and directors from the parent and they worked in Pennsylvania. EverNu Tech, 2010 WL 3419892, at *4-5. The plaintiff in EverNu Tech argued

that the subsidiary was directed and controlled by the parent corporation in Michigan pursuant to a policy adopted when the parent corporation acquired the subsidiary. The policy required the parent corporation to approve the subsidiary's contracts valued over $300 million. Id. at *3-4. The court disagreed with the plaintiff, and found that the subsidiary's "existence, operations, and autonomy . . . remained largely unaffected by the acquisition." Id. at *4. The subsidiary filed its own tax returns and "all the legal work, intellectual property licensing, information technology services, financial filings, and corporate governance services" for the subsidiary took place in Pennsylvania. Id. The court found that the majority of the subsidiary's contracts did not require the parent corporation's approval. The court held that although the most important decisions were made by the parent corporation in Michigan pursuant to corporate policy, all other decisions regarding the actual direction and control of the subsidiary took place in Pennsylvania, and therefore, Pennsylvania was the nerve center of the corporation. Id.

16.     EverNu Tech is distinguishable from this case because unlike the subsidiary in EverNu Tech, Milso did not have high level officers who were different from the officers of its corporate parents, and Milso did not operate autonomously from its corporate parents during the relevant time period. Following the settlement of the 2007 lawsuit, Milso's administrative functions were moved to Pittsburgh, Pennsylvania, and Milso's Brooklyn, New York office became a location for regional marketing and meetings. Milso's four high level officers, who also worked for Matthews' various entities, directed and controlled Milso from offices in Pittsburgh, Pennsylvania, which were also their offices for Matthews and York Group. Matthews provided Milso with information technology, tax return preparation, credit and collections, accounts payable, and human resources services at the Pittsburgh, Pennsylvania office, and Milso paid for those services through inter-corporate charges. Milso was an active corporation

with its own customer base and revenue exceeding $100 million during the relevant time period, but the court does not find that it was run autonomously from its corporate parent like the subsidiary in EverNu Tech.

17.     Defendants erroneously rely upon DeLuca v. Allstate New Jersey Ins. Co., No. 11-4129, 2011 WL 3794229 (D.N.J. Aug. 25, 2011), in which the court found the principal place of business for a subsidiary of the Allstate Insurance Company was located in New Jersey although its corporate parent was located in Illinois. DeLuca, 2011 WL 3794220, at *5. Defendants argue that the situation in DeLuca is similar to the present case because much like Matthews and Milso shared officers, Allstate's Illinois parent and New Jersey subsidiary shared officers who worked from the parent corporation's headquarters in Illinois. (See ECF No. 222 at 21-22.) The court in DeLuca found the subsidiary to have its own distinct principal place of business because although the subsidiary's board of directors and some of the officers worked from the parent corporation's headquarters, the court was not provided sufficient evidence to determine whether the directors and officers actually exercised their controlled over the subsidiary from that location. DeLuca, 2011 WL 3794220, at *5. In finding the subsidiary's principal place of business was different than its parent corporation's principal place of business, the court found that, unlike Milso, the subsidiary had its *own* president and chief executive officer who worked from the subsidiary's office in New Jersey. Id. at *4. The court also based its decision on the subsidiary's controller, human resources department, middle management, and about 100 employees working from that location. Id. at *4-5. Based on that evidence, the court found the subsidiary's principal place of business was distinct from its corporate parent's principal place of business. In the present case, all Milso's high level officers and four of its five directors worked from Matthews' offices located in Pittsburgh, Pennsylvania. Unlike the court in

DeLuca, however, this court was presented with credible evidence that Milso's officers actually directed and controlled Milso from that location.

18.     Defendants similarly rely upon Agostini v. Piper Aircraft Corp, No. 11-7172, 2012 WL 646025, at *3-4 (E.D. Pa. Feb. 29, 2012). In Agostini, the court found a subsidiary of Massachusetts corporation had a principal place of business distinct from its parent's place of business because although corporate headquarters, records, and officers were located in Massachusetts, the actual direction, control, and coordination of the corporation took place in Pennsylvania. Agostini, 2010 WL 646025, at *3-4. The court based its determination on the parent corporation's failure to prove that "any corporate activity had been directed, controlled, or coordinated" from Massachusetts, despite the fact that the subsidiary's officers worked in that state. Agostini, 2010 WL 646025, at *4. Agostini is distinguishable from the present case because the greater weight of the evidence in this case proves that the officers working from Pittsburgh, Pennsylvania were actually directing and controlling Milso. The officers made decisions with respect to Milso's financial operations, potential acquisitions, budget, employees, and strategic plan from Two North Shore Center, Pittsburgh, Pennsylvania, during the relevant time period.

19.     Defendants failed to present evidence that the direction and control of Milso, a corporation which had administrative offices in Pittsburgh, Pennsylvania, a manufacturing facility in Richmond, Indiana, and distribution facilities throughout the United States, took place in Brooklyn, New York. The court is not persuaded by defendants' argument that after the settlement of the 2007 lawsuit, Andrew Pontone, who was not an officer of Milso, was directing, coordinating, and controlling "what was left" of Milso's business from Brooklyn, New York. (ECF No. 222 at 16, 18.)

20.     Defendants' reliance on Andrew Pontone's role as the sales manager in the northeast as an indication of Milso's principal place of business is misplaced under the Hertz analysis. The Fourth Circuit Court of Appeals applied Hertz in Central West Virginia Energy Co., Inc. v. Mountain State Carbon, LLC, 636 F.3d 101, 107 (4th Cir. 2011), which this court finds to be persuasive. In Central West Virginia Energy, the court held a subsidiary's principal place of business was not where its day-to-day management activities took place, but instead, where it's high level officers directed and controlled the corporation. Id. In Central West Virginia Energy, a West Virginia coal sales company brought suit against a Virginia corporation, Mountain State Carbon, and a Michigan corporation, Severstal Wheeling, in federal district court. Id. at 102. The defendant corporations filed a motion to dismiss the complaint arguing that diversity jurisdiction was lacking because Severstal Wheeling, a subsidiary of a parent corporation that had offices located in Michigan and Russia, was actually a West Virginia corporation. Id. at 102-07.  The court held that Severstal's principal place of business was in Michigan, the same location as its parent corporation's principal place of business, because seven of Severstal's eight high-level officers, including the corporation's chief executive officer, general counsel, and secretary, worked in Dearborn, Michigan and made significant corporate decisions there. Id. at 107. The court made this ruling despite the subsidiary's day-to-day operations, including purchasing materials, selling products, managing environmental compliance, and various human resources services, taking place in West Virgina. Id. Applying Hertz, the court found "the fact that [the officers] may also be engaged in affiliated companies' business activities [was] of no import" and emphasized that Michigan, not West Virginia, was the site where the officers were located and directed high-level decisions. Id. 107.

21.     Under Hertz and Central West Virginia Energy, Andrew Pontone's role as the

regional sales manager from the Brooklyn, New York office is not sufficient to establish that Milso's nerve center was Brooklyn, New York. Although Andrew Pontone was involved in the day-to-day management functions of Milso and took part in strategic planning meetings, he did not have ultimate authority over Milso's strategic direction, budget, acquisitions, or capital expenditures, and he only had authority to hire employees if the officers in Pittsburgh, Pennsylvania gave him clearance to do so. (ECF No. 227 at 96.) Andrew Pontone testified that, while he was responsible for the day-to-day sales functions in the northeast from the Brooklyn, New York location, Milso's direction and strategy came from the officers in Pittsburgh, Pennsylvania. (ECF No. 227 at 89-91.)  The court finds Andrew Pontone's control over the day-to-day sales functions of Milso equivalent to the day-to-day management functions that the Court of Appeals for the Fourth Circuit found were insufficient to establish a corporation's principal place of business in Central West Virginia Energy. The court makes this determination in light of Andrew Pontone not being a high level officer within Milso and not exercising direction or control over Milso to the extent required by Hertz during the relevant time period. At all relevant times, the high level officers in Pittsburgh, Pennsylvania, directed and controlled Milso.

22.     Defendants maintain, however, that Milso was not directed or controlled by the officers in Pittsburgh, Pennsylvania because both the board of directors and the executive committee failed to act during the relevant time period. Defendants point to the lack of formal documentation in Milso's corporate minute book and the lack of notice provided to Harry Pontone as a member of the board of directors and executive committee as evidence of the board of directors' and executive committee's lack of direction or control over Milso throughout the relevant time period. Plaintiffs allege that Milso's board of directors had four or five meetings throughout the relevant time period, and that the minutes from those meetings have gone

missing. Regardless whether the board of directors met during the relevant time period, credible evidence was presented that the high level officers met informally on a daily basis to discuss the direction and control of Milso. The lack of documentation with respect to formal board meetings or executive committee meetings, therefore, is not determinative with respect to Milso's principal place of business. Under <u>Hertz</u>, the nerve center is "not simply an office where the corporation holds its board meetings." <u>Hertz</u>, 130 S.Ct. at 1192. The determination of a corporation's principal place of business does not necessarily depend on board action or inaction or the location of board meetings. The court must base its decision on the corporation's actual center of direction, control, and coordination. <u>See</u> <u>Hertz</u>, 130 S.Ct. at 1192. The court finds that the high level officers directed and controlled Milso through their meetings and interactions in Pittsburgh, Pennsylvania, and the decisions they made in the Pittsburgh, Pennsylvania office as they carried out their roles and various duties as officers of Milso during the relevant time period.

23. Defendants presented evidence of various admissions made by Milso that indicated Brooklyn, New York was the corporation's principal place of business. The court finds these admissions do not override the determination that must be made with respect to where the high level officers *actually* directed or controlled the corporation. In <u>Mennen Co. v. Atlantic Mutual Insurance, Co.</u>, 147 F.3d 287, 293-94 (3d Cir. 1998), the Court of Appeals for the Third Circuit held that a plaintiff company's pleadings in unrelated litigation were an insufficient basis to establish the company's principal place of business because a party cannot establish jurisdiction by merely stating that it exists. In making this determination, the court held:

> We do not find that these prior Federal pleadings have evidentiary value for the purpose of assessing where Federal's principal place of business is located. The representations made in these pleadings run contrary to the empirical facts with which the jurisdictional inquiry is

concerned. While pleadings that contain unwarranted assertions as to matters bearing on jurisdiction reflect no great credit on the attorneys who apparently drafted and filed them without sufficient inquiry, the pleadings themselves have no intrinsic capacity either to establish or disestablish jurisdiction; it is axiomatic that a party may not confer or defeat jurisdiction by mere pleading. **Rather, subject-matter jurisdiction depends upon facts of record, and when any question arises as to the existence of jurisdiction a federal court is obligated to make an independent determination of those facts.**

Id. at 293-94 (citations omitted) (emphasis added). Following the court's rationale in Mennan, the court finds plaintiffs' various admissions indicating Brooklyn, New York was Milso's principal place of business are not determinative; those admissions cannot override the independent factual inquiry that must be made under Hertz to determine where the high level officers actually directed and controlled the corporation.

24.     Defendants filed this motion to dismiss after receiving plaintiffs' answers to interrogatories # 3 and #4 of defendant Pontone Casket's first discovery request, which indicated that Brooklyn, New York was Milso's principal place of business. Defendants argue that the answers to the interrogatories serve as testimonial evidence that Milso's principal place of business was located in Brooklyn, New York during the relevant time period. (ECF No. 200 at 11.) Defendants also asserted that plaintiffs were bound by their first admissions and could not contradict them. (ECF No. 200 at 12-14.)  The court finds that plaintiffs' answers to interrogatories #3 and #4 were evidentiary admissions, and therefore, plaintiffs were not bound by their first answers. (ECF No. 202 at 9-13.) Under the rationale set forth in Mennan, furthermore, the admissions by themselves cannot establish Milso's principal place of business.

25.     Defendants argued that Milso's July 15, 2011 tax filing in which New York is listed as the corporation's headquarters proves that Milso's principal place of business was Brooklyn, New York during the relevant time period. (ECF No. 222 at 2.) In Hertz, the Supreme

Court rejected the argument that the mere filing of a form listing a corporation's place of business "would, without more, be sufficient proof to establish a corporation's 'nerve center.'" Hertz, 130 S. Ct. at 1195. Following Hertz, courts have specifically rejected corporate reports, tax filings, and corporate-registration statements as being evidence sufficient to demonstrate a corporation's principal place of business. See Ballard v. Union Carbide Company, No. 2:11-0366, 2011 WL 4597349, at *2-3 (S.D.W.Va. Oct. 3, 2011) (holding corporate filings listing a corporation's principal place of business are insufficient to show the actual place of business); Balachander v. AET Inc. Limited, No. H-10-4805, 2011 WL 4500048, at *8-9 (S.D. Tex. Sept. 27, 2011). Here, plaintiffs also presented evidence of other forms, which listed Pittsburgh, Pennsylvania as Milso's principal place of business during the relevant time period. (3/16/2012 Tr. at 147-48; Pls.' Ex. 8.) While it certainly reflects no credit on the persons responsible for filing the forms to identify different principal places of business for Milso, the court finds that in light of the credible evidence proving the high level officers actually directed and controlled Milso from Pittsburgh, Pennsylvania, the July 15, 2011 tax filing is an insufficient basis for the court to find Milso's principal place of business is Brooklyn, New York.

26.     Defendants presented evidence of a press release issued on August 4, 2010 to announce Harry Pontone's retirement, which indicated Milso had operated from its Brooklyn, New York location for eighty years, and a Milso business card naming Brooklyn, New York as Milso's headquarters, to prove that the Pontone family "ran, directed, and controlled" Milso from Brooklyn, New York. (ECF No. 200 at 10, 11-12.)  The court does not find the press release or business card essential to its determination in this case. As the Supreme Court noted in Hertz, the nerve center of a corporation will not necessarily be where the business activities visible to the public take place. Id. at 1194. Milso issuing communications to the public indicating the business

continued to be run and was headquartered in Brooklyn, New York does not affect this court's determination that based upon the evidence of record, Milso was directed and controlled from Pittsburgh, Pennsylvania.

27.     Defendants also rely on testimony and a written statement from the 2007 lawsuit in which Bartolacci stated that Milso's headquarters were located in Brooklyn, New York to prove Milso's principal place of business was Brooklyn, New York. (ECF No. 200 at 11.) The first statement defendants rely upon was made during a deposition on August 19, 2008, in which Bartolacci stated a Milso meeting took place at the corporation's "headquarters in Brooklyn." (ECF No. 200-2 at 27.) The meeting Bartolacci referenced in his deposition took place in 2007 prior to the settlement of the 2007 lawsuit and the cessation of Milso's administrative functions in Brooklyn, New York, which took place after Harry Pontone and Scott Pontone resigned as high level officers of Milso in 2007. (Id.) Bartolacci's second statement was that Harry Pontone "became President of York and directed the day-to-day operations of Matthews's casket division from Milso's corporate headquarters in Brooklyn, New York." (ECF No. 200-2 at 30.)  During the relevant time period, Harry Pontone no longer served as president of Milso. He resigned as president in 2007 after the settlement of the 2007 lawsuit when Milso's administrative activities ceased in Brooklyn, New York. These statements do not prove Milso's principal place of business during the relevant time period because they refer to a prior period of time when Harry Pontone and Scott Pontone were both high level officers of the corporation working in Brooklyn, New York. Even if the statements were made with respect to the relevant time period, however, they would not be determinative. Under Mennan, the court cannot simply rely upon the statements of a party to determine a corporation's principal place of business, and instead, must make an independent factual inquiry to determine where the high level officers *actually* directed

and controlled the corporation regardless of any statements made by the parties to the contrary. See Mennen, 147 F.3d at 293-294.

28.     Based on the evidence of record, the parties' submissions, and the credible testimony given by Milso's officers, the court finds that Milso's high level officers performed functions relating to the direction, control, and coordination of Milso's activities in Pittsburgh, Pennsylvania. Pennsylvania, therefore, is the state where Milso's principal place of business is located under controlling law. Since no plaintiff is a citizen of the same state as a defendant, this court has subject-matter jurisdiction over the case based on diversity of citizenship. The Pontone defendants' motion to dismiss will be denied.

## I.     Order

AND NOW, this 31st day of July, 2012, upon consideration of the record and the parties' submissions, IT IS HEREBY ORDERED that for the reasons set forth above the Pontone defendants' Motion to Dismiss for Lack of Jurisdiction (ECF No. 183) is DENIED.

By the court:


/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge