**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

THE YORK GROUP, INC., MILSO    )
INDUSTRIES CORPORATION, and  )
MATTHEWS INTERNATIONAL    )
CORPORATION,                     )
                                  )
        Plaintiffs,          )
                                    )
      v.                     )      **Civil Action No. 10-1078**
                                    )
SCOTT PONTONE, HARRY       )
PONTONE, BATESVILLE CASKET  )
COMPANY, INC., and PONTONE   )
CASKET COMPANY, LLC,       )
                                    )
        Defendants.      )

**MEMORANDUM OPINION**

**Conti, Chief District Judge**

## I.    <u>Introduction</u>

The instant action involves alleged breaches of restrictive covenants executed in connection with the sale of a family business consisting of the manufacturing and distribution of caskets. Pending before the court are five motions for summary judgment including thirty-one claims, including counterclaims, filed by the parties pursuant to Federal Rule of Civil Procedure 56. ECF Nos. 462, 463, 467, 472 & 473. All five motions will be addressed in this memorandum opinion. For the reasons that follow, two of the motions will be denied in their entirety (*ECF Nos. 462 & 473*), and the remaining three motions (*ECF Nos. 463, 467 & 472*) will be granted in part and denied in part.

## II.    <u>Background</u>[1]

---

[1] Facts relevant to specific issues will be addressed in the discussion about those issues.

Matthews International Corporation ("Matthews") is a Pennsylvania corporation maintaining its principal place of business in Pittsburgh, Pennsylvania. ECF No. 70 ¶ 8. The York Group, Inc. ("York Group"), a subsidiary of Matthews, is incorporated under the laws of Delaware. *Id.* ¶ 6. Like Matthews, York Group operates out of Pittsburgh. Matthews is the second largest casket company in the United States. ECF No. 587 ¶ 1.

Harry Pontone ("Harry") and his son, Scott Pontone ("Scott"), operated Old Milso and its predecessor, the South Brooklyn Casket Company, for several years. ECF No. 587 ¶ 5. Several members of the Pontone family were involved in the business. *Id.* Old Milso was engaged in the business of manufacturing and distributing caskets. Non-family individuals also worked in the business, including Josephine Pesce ("Pesce"), who worked as Harry's administrative assistant, *id.* ¶ 4, and Joseph Redmond ("Redmond"), who served as Old Milso's warehouse manager, ECF No. 70 ¶ 70.

Midnight Acquisition Corporation ("Midnight"), a wholly-owned subsidiary of York Group, acquired Old Milso's assets on May 28, 2005. The acquisition was effectuated by an asset purchase agreement executed by the parties. ECF No. 4-1. The sale closed on July 11, 2005, and Midnight's name was changed to Milso Industries Corporation ("Milso"). Members of the Pontone family were paid a lump sum of $95,000,000.00 pursuant to the terms of the agreement. ECF No. 480-1 at 21. The agreement also provided for the payment of contingent consideration under specified circumstances. *Id.*

In the aftermath of the acquisition, Harry and Scott served respectively as York Group's president and vice president. They both served as members of York Group's board of directors. To effectuate the arrangement, Harry and Scott executed "key employee" employment agreements with York Group. ECF Nos. 470-1 & 480-2. Section 1.01 of those agreements

provided that Harry and Scott would perform "duties substantially similar to those performed for the [b]usiness" prior to the acquisition.  ECF No. 470-1 at 2; ECF No. 480-2 at 1.  As the president, Harry was given "exclusive control" over York Group's operations, including the hiring and firing of employees, employee compensation, product pricing, and the implementation of its business strategy.  ECF No. 480-2 at 2.  The agreement governing the terms of Harry's employment provided that his service as the president would "continue until the close of business on September 30, 2010."  *Id.*  Subject to certain conditions, the agreement governing the terms of Scott's employment provided that he would become York Group's president for the balance of Harry's term in the event that Harry ceased to serve in that capacity "for any reason."  ECF No. 470-1 at 3.

Section 4.06 of the employment agreements prohibited Harry and Scott from engaging in a "Competing Business" during their terms of employment and for an additional three years. ECF No. 470-1 at 14; ECF No. 480-2 at 13.  The term "Competing Business" was defined broadly enough to include "any person, corporation or other entity" involved in the manufacture, marketing or selling of "caskets, urns, memorials or cremation equipment."  *Id.*  Each of the employment agreements also contained the following language:

> 4.07.  <u>Non-Solicitation of Customers and Suppliers</u>.  Employee agrees that while employed hereunder he shall not, directly or indirectly, solicit the trade of, or trade with, any customer, prospective customer or supplier of [York Group] with respect to the manufacture or sale of caskets, urns, memorials or cremation products for any business purpose other than for the benefit of the Company. Employee further agrees that following the termination of Employee's employment with [York Group], to the same extent and for the same period (if any) that the Employee continues to be subject to the restrictions of Section 4.06, Employee shall not, directly or indirectly, solicit the trade of, or trade with, any customers or prospective customers or suppliers of [York Group] with respect to the manufacture or sale by [York Group] of caskets, urns, memorials or cremation products, or the supplies necessary to manufacture the same.

4.08. <u>Non-Solicitation of Employees</u>.  Employee agrees that following termination of Employee's employment with [York Group], and to the same extent and for the same period (if any) that the Employee continues to be subject to the restrictions of Section 4.06, Employee shall not, directly or indirectly, solicit or induce, or attempt to solicit or induce, any employee of the Company to leave [York Group] for any reason whatsoever, or hire any such employee.  This Section 4.08 will not prohibit Employee from engaging in general advertising or solicitation not specifically targeted at any one or more employees of [York Group] and shall not prohibit Employee from hiring any employee of [York Group] that contacts Employee as a result of such general advertising or solicitation.

ECF No. 470-1 at 14-15; ECF No. 480-2 at 13-14.  Section 4.01 of the employment agreements prohibited Harry and Scott from misappropriating or disclosing confidential information without York Group's written consent.  ECF No. 470-1 at 12-13; ECF No. 480-2 at 11-12.  Under Section 1.07 of the agreements, Harry and Scott were not permitted to "appropriate" York Group's "business opportunities" for their "own benefit."  ECF No. 470-1 at 9; ECF No. 480-2 at 8.  Choice-of-law clauses provided that the agreements were to "be governed by and construed in accordance with the laws of the State of New York."  ECF No. 470-1 at 16; ECF No. 480-2 at 15.

At some point, York Group apparently started to exercise some control over Milso's operations.  On March 30, 2007, Harry and Scott sued York Group in the Supreme Court of the State of New York, County of New York, contending that York Group personnel had breached Section 1.01 of the employment agreement with Harry by undermining his authority and encroaching on his responsibilities as the president.  ECF No. 191-2.  The case was settled in May 2007.  ECF No. 587 ¶ 27.  Harry resigned from his position as York Group's president and became the chairman of its board of directors, a member of Milso's board of directors, and a member of the executive committees of both York Group and Milso.  ECF No. 70 ¶ 51.  Scott voluntarily resigned from his positions with York Group.  ECF No. 28-3 at 2.  York Group,

Matthews and Milso agreed to pay him "severance compensation" in the amount of $300,000.00 per year for a period of three years. *Id.* The contractual provisions prohibiting Scott from soliciting customers and suppliers were to remain effective through May 30, 2010. ECF No. 587 ¶ 30. The provision prohibiting him from soliciting employees of York Group or Milso was to remain in effect through May 30, 2011. *Id.* ¶ 31. These terms were expressed in an amendment to Scott's employment contract executed in connection with the settlement agreement. ECF No. 28-3 at 2-5.

In January 2008, Scott became engaged in the business of selling insurance to operators of funeral homes. Civil Action No. 08-6314 (S.D.N.Y.), ECF No. 1 ¶ 39. He employed eight individuals to market his insurance products. *Id.* Seven of Scott's eight employees had never been employed by York Group. *Id.* The other employee had apparently left York Group to work for a different employer before joining Scott's sales force. *Id.*

Several manufacturers and distributors of caskets spoke to Scott about utilizing his sales force to market and sell caskets. Civil Action No. 08-6314 (S.D.N.Y.), ECF No. 1 ¶ 40. Scott responded to those communications by informing his prospective business partners about the non-competition and non-solicitation provisions of his amended contract with York Group. *Id.* ¶ 41. The prospective business partners expressed a willingness to proceed with their proposed ventures only if they could be assured that such conduct would not contravene the restrictive covenants. *Id.*

On July 14, 2008, Scott commenced an action against Matthews, York Group and Milso in the United States District Court for the Southern District of New York, seeking a declaration that the non-competition and non-solicitation provisions of his amended employment contract were invalid under New York law. Civil Action No. 08-6314 (S.D.N.Y.), ECF No. 1 ¶¶ 47-53.

Four days later, he moved for the entry of a preliminary injunction prohibiting the enforcement of the restrictive covenants or the termination of his severance payments in retaliation for his proposed business activities. Civil Action No. 08-6314 (S.D.N.Y.), ECF No. 9. The district court denied Scott's motion in a memorandum opinion and order dated October 10, 2008. *Pontone v. York Group, Inc.*, Civil Action No. 08-6314, 2008 U.S. Dist. LEXIS 80372 (S.D.N.Y. Oct. 10, 2008). Two days after the rendering of the district court's decision, Scott voluntarily dismissed the action pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i). Civil Action No. 08-6314 (SDNY), ECF No. 34.

In January 2010, Scott incorporated the Pontone Casket Company, LLC ("PCC"), under the laws of New York. ECF No. 587 at 79, ¶ xxvii. On June 22, 2010, Pesce and Redmond left their positions with Matthews and started to work for Batesville Casket Company, Inc. ("Batesville"). *Id.* at 82, ¶ xxxvii. Batesville is the plaintiffs' main competitor. *Id.* at 38, ¶ 70. Two days later, Scott became a consultant for Batesville. *Id.* at 34, ¶¶ 65, 82, ¶ xxxvii. The sales consulting agreement was executed through PCC. *Id.* at 35, ¶ 66. Pesce and Redmond were provided with American Express credit cards issued in PCC's name. *Id.* at 91, ¶ li.

Matthews, York Group and Milso commenced this action against Scott and Batesville on August 16, 2010, asserting claims grounded in alleged breaches of the amended employment contract. ECF No. 1. Harry retired from his positions with York Group and Milso in September 2010. ECF No. 587 at 39-41, ¶¶ 72, 90-91, ¶ l. In an amended complaint filed on February 28, 2011, Matthews, York Group and Milso added Harry and PCC as defendants. ECF No. 70. Batesville, Scott, Harry and PCC subsequently filed a series of counterclaims against Matthews, York Group and Milso.[2] ECF Nos. 236, 308 & 333.

---

[2] Batesville originally asserted counterclaims for abuse of process and malicious prosecution. ECF No. 236 ¶¶ 82-91. Those claims were dismissed without prejudice on August 14, 2012.

On December 15, 2011, Scott, Harry and PCC moved for the dismissal of this action

pursuant to Federal Rule of Civil Procedure 12(b)(1). ECF No. 182. The motion to dismiss was

denied in a memorandum opinion and order dated July 31, 2012. *York Group, Inc. v. Pontone*,

Civil Action No. 10-1078, 2012 U.S. Dist. LEXIS 106695 (W.D.Pa. July 31, 2012). The parties

collectively filed five motions for summary judgment on March 8, 2013. ECF Nos. 462, 463,

467, 472 & 473. All five motions will be addressed in this memorandum opinion.[3]

## III.    Standard of Review

Summary judgment may only be granted where the moving party shows that there is no

genuine dispute about any material fact, and that a judgment as a matter of law is warranted.

FED. R. CIV. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter

summary judgment against a party who fails to make a showing sufficient to establish an element

essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex

Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret

the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in

his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

The burden is initially on the moving party to demonstrate that the evidence contained in

the record does not create a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas

Co.*, 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a

reasonable trier of fact could render a finding in favor of the nonmoving party. *McGreevy v.

Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of

---

[3] The parties filed various motions to strike certain portions of the record due to alleged instances of noncompliance
with case management orders. ECF Nos. 582, 588 & 599. The court perceives no prejudice to any party from the
alleged noncompliance as the record is fully before court and all parties had more than adequate opportunity to brief
the numerous dispositive motions. Those motions will be denied. Batesville's motions for oral argument will also
be denied. The briefing on the dispositive motions is robust and the court reviewed sufficient written argument,
which negates the need for oral argument. ECF Nos. 568 & 632.

proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. *Celotex Corp.*, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## IV.    Jurisdiction and Venue

The court has jurisdiction in this case pursuant to 28 U.S.C. § 1332(a)(1). Venue is proper under 28 U.S.C. § 1391(b).

## V.    Discussion

In the amended complaint, Matthews, York Group and Milso purported to assert claims under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), against Scott and PCC. ECF No. 70 ¶¶ 174-184. Those claims were dismissed on August 24, 2011. ECF No. 141 at 21. The pending motions for summary judgment implicate the claims remaining in the amended complaint. Those claims include breach-of-contract claims against Scott and Harry, a breach-of-fiduciary-duty claim against Harry, tortious interference with contractual relations claims against Scott, Harry and Batesville, and unfair competition and unjust enrichment claims against Scott, Harry, PCC and Batesville. ECF No. 70 ¶¶ 123-73, 185-96. Batesville and the remaining defendants separately move for summary judgment with respect to all claims asserted against them in the amended complaint. ECF Nos. 462 & 472.

On April 25, 2012, Batesville filed counterclaims against Matthews, York Group and Milso for tortious interference with prospective economic advantage, abuse of process, malicious prosecution, unjust enrichment, and breach of a restrictive covenant involving former Batesville sales representative Kathy Brooks ("Brooks"). ECF No. 236 ¶¶ 68-113. The court dismissed without prejudice the abuse of process and malicious prosecution claims on August 14, 2012. Matthews, York Group and Milso move for summary judgment with respect to Batesville's remaining counterclaims. ECF No. 463.

On August 17, 2012, Scott, Harry and PCC filed eighteen separate counterclaims against Matthews, York Group and Milso. ECF No. 308. Amended counterclaims, including a new claim for defamation and previously-asserted claims for abuse of process, were filed on October 2, 2012. ECF No. 333. On May 22, 2013, the court filed a memorandum opinion and order dismissing without prejudice the abuse of process claims. ECF No. 579. Scott, Harry and PCC continue to assert counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with prospective business advantage, unjust enrichment, unfair competition, misappropriation of Harry's name, image and likeness, defamation, intrusion on seclusion, and false and misleading advertising. ECF No. 333 ¶¶ 165-266, 279-99. Scott and Harry also seek declaratory and injunctive relief in relation to their contractual obligations under their respective employment agreements with York Group. *Id.* ¶¶ 300-20. Matthews, York Group and Milso seek summary judgment with respect to the remaining seventeen counterclaims asserted by Scott, Harry and PCC. ECF No. 467. Scott and Harry move for partial summary judgment with respect to their counterclaims seeking declaratory and injunctive relief. ECF No. 473.

## A. The Validity of the Restrictive Covenants

Among the thirty-one claims currently pending in this case, only two are subject to cross-motions for summary judgment. Those claims are the counterclaims seeking declarations that certain restrictive covenants found in the employment agreements are invalid. ECF No. 333 ¶¶ 300-20; ECF Nos. 467 & 473. Since many of the other claims asserted in this action center on the disputed contractual provisions, the court will consider the validity of the restrictive covenants before addressing the remaining issues.

### 1. Collateral Estoppel Asserted by Matthews, York Group and Milso

Matthews, York Group and Milso raise the affirmative defense of collateral estoppel in defense of the challenges brought to the restrictive covenants. ECF No. 468 at 35-38. This defense is based on the October 10, 2008, decision denying Scott's motion for a preliminary injunction. *Pontone*, 2008 U.S. Dist. LEXIS 80372. The preclusive effect of a decision rendered by a federal court is governed by federal common law. *Smith v. Bayer Corp.*, 131 S.Ct. 2368, 2376 n.6 (2011). Uniform federal rules of preclusion apply to judgments entered in federal-question cases. *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008). When a federal-court judgment in a diversity case is at issue, federal common law incorporates the applicable state rules of preclusion to the extent that those rules are not "incompatible with federal interests." *Semtek International, Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508-09 (2001). Like most jurisdictions, New York applies the doctrine of collateral estoppel only where "the identical issue was necessarily decided in the prior action or proceeding and is decisive of the present action." *Howard v. Stature Electric, Inc.*, 986 N.E.2d 911, 913-14 (N.Y. 2013). The prior action concerned only the validity of the provisions in Scott's amended employment agreement prohibiting him from engaging in competitive conduct and soliciting former customers and

suppliers for a period of three years. *Pontone*, 2008 U.S. Dist. LEXIS 80372, at *4-5. Those

provisions are not being challenged in this action. ECF No. 333 ¶ 300-20. Under these

circumstances, the counterclaims asserted in this action are not precluded by the decision

rendered in the earlier action. *Hawksbill Sea Turtle v. Federal Emergency Management Agency*,

126 F.3d 461, 474-77 (3d Cir. 1997); *PG Publishing Co. v. Aichele*, 902 F.Supp.2d 724, 742-44

(W.D.Pa. 2012).

### 2. Choice-of-Law Rules

A federal court sitting in diversity normally applies the choice-of-law rules applicable in

the state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.*, 313 U.S. 487,

496-97 (1941). Choice-of-law clauses contained in the relevant employment agreements

provided that they were to "be governed by and construed in accordance with the laws of the

State of New York." ECF No. 470-1 at 16; ECF No. 480-2 at 15. Contractual provisions of this

kind are generally enforceable under Pennsylvania law. *Kruzits v. Okuma Machine Tool, Inc.*,

40 F.3d 52, 55-56 (3d Cir. 1994). In light of the choice-of-law clauses, the parties have

stipulated that New York law governs the terms of the employment agreements. ECF No. 159 at

2. Consequently, the court will consider the validity of the challenged contractual provisions in

accordance with the law of New York.

### 3. Non-disclosure/Confidentiality Provisions

When Scott and Harry executed their respective employment agreements with York

Group, they agreed to the following terms:

> 4.01. <u>Non-Disclosure of Confidential Information</u>. Employee agrees to
> hold and safeguard the Confidential Information in trust for the Company, its
> successors and assigns and agrees that he or she shall not, without the prior
> written consent of the Company, misappropriate or disclose or make available to
> anyone for use outside the Company's organization at any time, either during his
> employment with the Company or subsequent to the termination of his

employment with the Company for any reason, including without limitation
termination by the Company for Cause or without Cause, any of the Confidential
Information, whether or not developed by Employee, except as required in the
performance of Employee's duties to the Company. Without limitation,
Employee shall not be permitted to remove Confidential Information from
Company computer servers to use for any personal purpose.

ECF No. 470-1 at 12-13; ECF No. 480-2 at 11-12. The agreements define the term

"Confidential Information" to mean

information concerning the Company's sales, sales volume, sales methods,
sales proposals, customers and prospective customers, identity of customers
and prospective customers, identity of key purchasing personnel in the employ
of customers and prospective customers, amount or kind of customers'
purchases from the Company, the Company's sources of supply, the
Company's computer programs, system documentation, special hardware,
product hardware, related software development, the Company's manuals,
formulae, processes, methods, machines, compositions, ideas, improvements,
inventions or other confidential or proprietary information belonging to the
Company or relating to the Company's affairs.

ECF No. 470-1 at 12; ECF No. 480-2 at 11.

Scott and Harry maintain that these terms are "unreasonable and unnecessary to protect

[the] legitimate business interests" of Matthews, York Group and Milso. ECF No. 333 ¶ 304,

312. According to Scott and Harry, they would effectively "be barred for life from competing in

the casket industry" if the terms of their employment agreements were to be given full effect. *Id.*

¶¶ 306, 313. This assertion is based on the idea that the non-disclosure provisions were crafted

"to achieve the same effect" as "express non-compete provision[s]." ECF No. 479 at 2.

Matthews, York Group and Milso deny that the non-disclosure provisions should be construed

broadly enough to constitute *de facto* non-compete provisions. ECF No. 507 at 16. They

contend that the non-disclosure provisions, which remain effective for the duration of the lives of

Scott and Harry, can be enforced without depriving those individuals of opportunities to work in

the casket industry. *Id.* at 16-17.

Joseph C. Bartolacci ("Bartolacci"), the president and chief executive officer ("CEO") of Matthews, testified that, in his view, Scott and Harry could not effectively compete with Matthews in the New York market without breaching the non-disclosure provisions. ECF No. 348-1 at 94-102. Scott and Harry rely on Bartolacci's testimony for the proposition that Matthews, York Group and Milso are attempting to use the non-disclosure provisions as a pretext to force them out of the casket business. ECF No. 578 at 2-8. In the present context, however, the court must consider the provisions as drafted without conflating them with "the theory of inevitable disclosure." *Earthweb, Inc. v. Schlack*, 71 F.Supp.2d 299, 311-12 (S.D.N.Y. 1999).

Under New York law, a restrictive covenant is ordinarily "subject to specific enforcement [only] to the extent that it is *reasonable in time* and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *Reed, Roberts Associates, Inc. v. Strauman*, 353 N.E.2d 590, 593 (N.Y. 1976)(emphasis added). The requirement of durational reasonableness, however, does not apply in cases involving "only the so-called 'implied covenant' to refrain from soliciting former customers following the sale of the 'good will' of a business." *Mohawk Maintenance Co., Inc. v. Kessler*, 419 N.E.2d 324, 328 (N.Y. 1981). This principle derives from *Von Bremen v. MacMonnies*, 93 N.E. 186 (N.Y. 1910), in which the New York Court of Appeals explained:

> The good will, which the former owner thereof parts with *in invitum*, as in bankruptcy proceedings or by operation of law, as in the liquidation of a partnership by the lapse of time or its termination pursuant to the articles of copartnership, is a lesser property than the good will which is the subject of a voluntary sale and transfer by the owner for a valuable consideration. In the first class of cases the former owner remains under no legal obligation restricting competition on his part in the slightest degree; in the second class of cases the former owner, by his voluntary act of sale, has excluded himself from competing with the purchaser of the good will to the extent of having impliedly agreed that he will not solicit trade from customers of the old business. To this extent this

13

> good will is a more valuable property than the good will of a business which goes
> to a trustee in bankruptcy or a receiver or survivor of a partnership in liquidation.
> The good will which is the subject of a voluntary sale is, therefore, a different
> thing from the good will which the owner parts with perforce or under
> compulsion.

*Von Bremen*, 93 N.E. at 189.  In this vein, "[a] seller's 'implied covenant' not to solicit his [or

her] former customers is 'a permanent one that is not subject to divestiture upon the passage of a

reasonable period of time.'"  *Bessemer Trust Co., N.A. v. Branin*, 949 N.E.2d 462, 468 (N.Y.

2011) (quoting *Mohawk*, 419 N.E.2d at 329).  This implied covenant is based on the idea that a

transaction facilitating the sale of a business essentially constitutes "an attempt to transfer the

loyalties of the business' customers from the seller, who cultivated and created them, to the new

proprietor." *Bessemer*, 419 N.E.2d at 329.  When the seller of a business actively solicits his or

her former customers in connection with a competing business, he or she violates the law of New

York even in the absence of a contractual covenant restricting his or her ability to engage in

competitive conduct.  *Mohawk*, 419 N.E.2d at 329, n.6.

Matthews, York Group and Milso argue that the confidentiality provisions contained in

the employment agreements merely codify an employee's common-law duty to refrain from

disclosing proprietary information maintained by his or her employer.  ECF No. 468 at 39-40.

To the extent that those provisions prohibit the disclosure of "customers," it can certainly be said

that they prophylactically safeguard certain interests independently protected under the "implied

covenant" recognized in New York.  *Bessemer*, 949 N.E.2d at 469 (explaining that "[t]he

'implied covenant' not to solicit former customers bars a seller from taking affirmative steps to

directly communicate with them").  Scott and Harry attempt to distinguish this case from the

cases involving the "implied covenant" by pointing out that their respective employment

agreements were separate and distinct from the asset purchase agreement.  ECF No. 578 at 9.

That attempted distinction is unavailing. The employment agreements were executed on the same date as the asset purchase agreement. ECF No. 470-1 at 2; ECF No. 480-2 at 1. They became effective on the closing date specified therein.[4] *Id.* Like other members of the Pontone family, Scott and Harry received significant sums of money in connection with the sale. ECF No. 4 ¶ 10. The mere fact that separate agreements were executed does not mean that the overall context of the transaction can be ignored. Since New York law independently precluded Scott and Harry from competitively soliciting Milso's former customers for the duration of their lives, the confidentiality provisions appear to be enforceable to the extent that they prohibit the disclosure of those customers. *Reed, Roberts Associates*, 353 N.E.2d at 593 (declaring that "restrictive covenants will be enforceable to the extent necessary to prevent the disclosure or use of trade secrets or confidential customer information").

The purchasing habits of particular customers are not inevitably "confidential." *Earthweb*, 71 F.Supp.2d at 315. In this case, however, Scott and Harry are more limited in their dealings with former customers because they *sold* their family business. *Bessemer*, 949 N.E.2d at 468-470. Matthews, York Group and Milso were permitted to negotiate employment contracts providing more protection than that independently provided under New York's common law. *Mohawk*, 419 N.E.2d at 329 n.6. The court acknowledges that the employment agreements expressly permitted Scott and Harry to solicit former customers of York Group and Milso after the passage of three years. ECF No. 28-3 at 4; ECF No. 470-1 at 14-15; ECF No. 480-2 at 13-14. For this reason, Scott and Harry are not amenable to suit on the theory that they breached the implied covenant not to solicit former customers. *MGM Court Reporting Service, Inc. v.*

---

[4] The employment agreements would not have become effective if the asset purchase agreement had been terminated prior to the closing, or if some other event had prevented the closing's occurrence. ECF No. 470-1 at 2; ECF No. 480-2 at 1. Furthermore, the employment agreements incorporated certain definitions contained within the asset purchase agreement. *Id.*

15

*Greenberg*, 541 N.E.2d 405, 406 (N.Y. 1989). This court previously recognized that New York law permits parties to waive the implied covenant by agreement. ECF No. 72 at 9-10. It does not follow, however, that the existence of the implied covenant under New York law has no bearing whatsoever on the reasonableness of the employment contracts. Since New York law (in the absence of the agreements) would prohibit Scott and Harry from soliciting their former customers for the duration of their lives, it follows *a fortiori* that the parties were free to prohibit *contractually* the *disclosure* of those customers for an indefinite period of time. *Mohawk*, 419 N.E.2d at 329, n.6.

On the other hand, a confidentiality agreement utilized as a *de facto* restrictive covenant "can be a powerful weapon in the hands of an employer," especially since "the risk of litigation alone may have a chilling effect on the employee." *Earthweb*, 71 F.Supp.2d at 310. Bartolacci's testimony suggests that Matthews, York Group and Milso view any attempts by Scott and Harry to compete with them in the New York market as necessarily encompassing violations of the non-disclosure provisions. ECF No. 348-1 at 94-102. Some applications of the those provisions could restrain the activities of Scott and Harry in a manner that is inconsistent with the law of New York. Neither confidentiality clause has to be enforced or invalidated as an undifferentiated whole, since the New York Court of Appeals has found restrictive covenants to be severable. *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1226-1227 (N.Y. 1999). Given that the public policy implications of the non-disclosure provisions are not apparent from the record, the invalidity of those provisions in some contexts will be determined after the remaining factual issues in this case are tried. *Barbagallo v. Marcum LLP*, 820 F.Supp.2d 429, 449-50 (E.D.N.Y. 2011). In the meantime, the motion for partial summary judgment filed by Scott and Harry will

be denied.[5]  ECF No. 473.  The motion for summary judgment filed by Matthews, York Group

and Milso will be denied with respect to the counterclaims seeking declaratory and injunctive

relief from the application of the non-disclosure provisions.  ECF No. 463.

### B.	The Breach-of-Contract Claims

The asset purchase agreement provides:

> 12.1	Confidentiality.  Sellers and Shareholders hereby covenant and
> agree that, except as may be required by law, rule or regulation or court order, or
> as permitted by this Agreement, unless this Agreement is terminated, they will not
> at any time reveal, divulge or make known to any Person (other than Buyer or its
> agents and Affiliates) any information that relates to this Agreement, the
> transactions contemplated hereby or the Business (whether now possessed by
> Sellers or furnished by Buyer after the Closing Date), including, but not limited
> to, customer lists or other customer information, trade secrets or formulae,
> marketing plans or proposals, financial information or any data, written material,
> records or documents used by or relating to the Business that are of a confidential
> nature (collectively, the "Confidential Information").

ECF No. 4-1 at 47.  Matthews, York Group and Milso allege that Scott and Harry breached

Section 12.1 of the asset purchase agreement by disclosing their "customer lists and customer

information, trade secrets and other proprietary information" to Batesville.  ECF No. 70 ¶¶ 128,

146.  The breach-of-contract claims asserted against Scott and Harry are also based on

allegations that they violated their respective employment agreements by inducing Pesce and

Redmond to leave their prior positions and start working for Batesville.  Id. ¶¶ 129, 147.  Scott

and Harry move for summary judgment with respect to those claims.  ECF No. 472.

---

[5] Although Harry sought injunctive relief from other restrictive covenants contained in his employment agreement,
those covenants have already expired.  ECF No. 333 ¶¶ 300-10.  In any event, the reasons given by the United States
District Court for the Southern District of New York for upholding the challenged provisions in Scott's amended
employment agreement would appear to counsel in favor of a similar resolution in relation to Harry's employment
agreement.  *Pontone v. York Group, Inc.*, Civil Action No. 08-6314, 2008 U.S. Dist. LEXIS 80372, at *11-14
(S.D.N.Y. Oct. 10, 2008).

### 1. Choice-of-Law

The asset purchase agreement contains a choice-of-law clause declaring that it "shall be governed by and construed in accordance with the laws of the State of Delaware." ECF No. 4-1 at 56. In accordance with that clause, the parties have stipulated that Delaware law governs the breach-of-contract claims stemming from the asset purchase agreement. ECF No. 159 at 2. The asset purchase agreement also has a forum-selection provision stating that "any suit, action or proceeding arising [thereunder] shall be brought solely in the state or federal courts of Delaware." ECF No. 4-1 at 56. Scott and Harry maintain that Matthews, York Group and Milso breached the asset purchase agreement by bringing their claims in this court, thereby rendering those claims infirm. ECF No. 477 at 31-32. Matthews, York Group and Milso offer no coherent argument relating to the forum-selection clause. ECF No. 510 at 27, n. 14.

In *Atlantic Marine Construction Co., Inc. v. U.S. District Court for the Western District of Texas*, 134 S.Ct. 568, 577-78 (2013), the United States Supreme Court held that a contractual forum-selection clause agreed to by the parties had no impact on the propriety of venue under 28 U.S.C. § 1391. The Supreme Court explained that the proper method for enforcing the forum-selection clause was either a transfer pursuant to 28 U.S.C. § 1404(a) or the application of the doctrine of *forum non conveniens*. *Atlantic Marine*, 134 S.Ct. at 579-80. No opinion was expressed about whether the defendant in a breach-of-contract action could obtain a merits-based dismissal on the ground that the suit was commenced in violation of a forum-selection clause, since that issue had not been briefed by the parties. *Id.* at 580.

Scott and Harry do not move for a transfer. Instead, they merely contend that the apparent violation of the forum-selection clause justifies the dismissal of the breach-of-contract claims for merits-based reasons. ECF No. 477 at 31-32. The propriety of such a dismissal can

only be considered in relation to Delaware law.  The Delaware Supreme Court has held that the

doctrine of "unclean hands" should be applied to prelude a breach-of-contract claim only where

the plaintiff's independent breach is "repugnant."  *Smithkline Beecham Pharmaceuticals Co. v.*

*Merck & Co., Inc.*, 766 A.2d 442, 449-50 (Del. 2000).  Although the claims based on the asset

purchase agreement were filed in violation of the forum-selection clause, they are accompanied

by virtually identical claims arising under the employment agreements.  ECF No. 70 ¶¶ 128, 147.

Unlike the asset purchase agreement, the employment agreements are governed by New York

law.  ECF No. 159.  They contain forum-selection clauses requiring "any suit, action or

proceeding arising [thereunder to] be brought solely in the state or federal courts of Pittsburgh,

Pennsylvania or New York, New York."  ECF No. 470-1 at 16; ECF No. 480-2 at 15.  Matthews,

York Group and Milso could have strictly complied with all applicable forum-selection clauses

only by commencing two separate actions.  They adhered to the forum-selection clauses

contained in the employment agreements by filing suit in this court.  Given that only a small

subset of the claims asserted in this action are subject to the forum-selection clause in the asset

purchase agreement, the court cannot conclude that the "breach" attributable to the choice of this

forum was sufficiently "repugnant" to justify the dismissal of those claims under the law of

Delaware.[6]  *Smithkline Beecham*, 766 A.2d at 449-50.

Under New York law, a plaintiff proceeding with a breach-of-contract claim must

demonstrate the existence of an agreement, adequate performance on his or her part, a breach by

the defendant, and resulting damages.  *Fischer & Mandell LLP v. Citibank, N.A.*, 632 F.3d 793,

799 (2d Cir. 2011).  The elements of a breach-of-contract claim under Delaware law are not

materially different.  *VLIW Technology, LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del.

---

[6] The court expresses no opinion about whether Scott and Harry would have been entitled to have this case transferred to Delaware if they had moved for such a transfer pursuant to 28 U.S.C. § 1404(a).  *Atlantic Marine Construction Co., Inc. v. U.S. District Court for the Western District of Texas*, 134 S.Ct. 568, 579-82 (2013).

2003).  Scott and Harry contend that the record fails to establish that they breached their respective contractual obligations, or that any damages resulted from the alleged breaches.  ECF No. 477 at 14.

Under the amended employment agreement, Scott was not permitted to "directly or indirectly solicit or induce any employee of York Group, Inc. or Milso to leave either company or hire any such employee."  ECF No. 28-3 at 4.  It is undisputed that this prohibition, which remained effective for four years following Scott's departure, was in effect when Pesce and Redmond left their positions and started to work for Batesville.  *Id.*  Attempting to refute any assertion that he violated his contractual obligations, Scott asserts that Pesce and Redmond were employed only by Matthews and, therefore, not within the categories of York Group and Milso employees falling within the scope of the non-solicitation provision.  ECF No. 477 at 40.  Scott also argues that he did not "solicit or induce" Pesce or Redmond to leave Matthews in any event.  *Id.* at 41-44.

The record contains conflicting evidence concerning the employment status of Pesce and Redmond.  Pesce and Redmond submitted statements declaring that they had been employed by Matthews.  ECF No. 484-25 at 1-2, ¶¶ 3-8; ECF No. 485-8 at 1-2, ¶¶ 3-10.  Both individuals received their paychecks from Matthews.  ECF No. 511 at 27, ¶ 12, 31, ¶ 24.  Jennifer Ciccone ("Ciccone"), Matthews' vice president of Human Resources, responded in the affirmative when asked whether Pesce and Redmond were subject to a handbook describing certain policies pertaining to Matthews' employees.  ECF No. 485-6 at 26.  Nonetheless, the documentary record contains evidence suggesting that those individuals were employed by York Group and Milso.  On September 21, 2006, Redmond received a memorandum stating that Matthews "w[ould] be handling the payroll for Milso effective 10/01/2006."  ECF No. 518-107 at 2.  The memorandum

instructed Redmond to complete a "special payroll check request form" in order to "expedite payroll changes." *Id.* An "employee status change notice" form contained in the record indicates that Pesce "transfer[ed] from Milso to York" on December 29, 2007. ECF No. 518-97 at 2. In a declaration dated April 1, 2013, Ciccone stated that Pesce and Redmond had both become employees of Milso after the 2005 acquisition. ECF No. 518-94 at 3, ¶ 3. She confirmed that Pesce had later become a York Group employee in December 2007. *Id.* Ciccone declared that Redmond had remained a Milso employee until his resignation on June 22, 2010. *Id.* According to Ciccone, the fact that Pesce and Redmond had been paid by Matthews was attributable to the centralization of human resources and payroll records among employees of Matthews, York Group and Milso. *Id.* at 3, ¶ 5. Pesce and Redmond were listed on the payroll registers respectively for York Group and Milso. *Id.* at 3, ¶ 4. On the basis of the existing record, a reasonable trier of fact could conclude that Pesce and Redmond were within the categories of York Group and Milso employees falling within the non-solicitation provision found in Scott's amended employment agreement. ECF No. 28-3 at 4.

Pesce and Redmond started to work for Batesville on June 22, 2010. ECF No. 587 at 82-83, ¶ xxxvii. Scott became a Batesville consultant two days later. *Id.* Matthews, York Group and Milso allege that Scott breached the non-solicitation provision of his amended contract by inducing Pesce and Redmond to leave their positions with York Group and Milso in order to work for Batesville. ECF No. 70 ¶ 129. Scott denies that allegation. ECF No. 477 at 41-44.

In declarations signed in March 2013, Pesce and Redmond both denied that Scott or Harry had influenced their decisions to accept positions at Batesville. ECF No. 484-25 at 6, ¶ 30; ECF No. 485-8 at 4, ¶ 16. Pesce stated that she had approached Dave Bowers ("Bowers"), Batesville's director of sales for the Metropolitan Region, about a position at Batesville during

the Metropolitan Funeral Directors Golf Outing conducted in May 2010.[7]  ECF No. 484-25 at 6,

¶ 28.  This conversation evidently led to Pesce's hiring a few weeks later.  Redmond asserted

that he had gone to Batesville in search of better work hours, a greater potential for advancement,

and more job security.  ECF No. 485-8 at 2-3, ¶¶ 11-15.  He stated that his employment with

Batesville had resulted from an inquiry initiated by him in May 2010.[8]  *Id.* at 3, ¶ 15.

Pesce declared that she had feared losing her job at Matthews because her mother, a

seamstress, had been terminated by Matthews roughly four months after the settlement that had

resolved the 2007 lawsuit brought by Scott and Harry against York Group.  ECF No. 484-25 at

2-3, ¶¶ 9-14.  She explained that a letter to Harry from James P. Doyle ("Doyle"), a Matthews

official, had caused her to question her job security.  *Id.* at 4-5, ¶¶ 19-25.  The letter, which was

dated March 22, 2010, contained the following language:

> As you might expect, I was very disappointed with both the tone and content of
> your recent correspondence addressing the various proposals Matthews has
> communicated over the past year to extend your employment with the Casket
> Division.  Simply stated, I do not understand your alleged outrage or the manner
> in which you are now mischaracterizing Matthews' repeated good faith attempts
> to retain your services beyond the expiration of your existing employment
> agreement.
>
> Obviously, no one affiliated with Matthews ever attempted to "bribe" Josephine.
> To the contrary, we openly discussed with you in person our interest in expanding
> Josephine's sales role and, prior to formally doing so, specifically sought your
> approval.  When this idea was presented to you, you expressed both satisfaction
> and unequivocal support for increasing Josephine's responsibilities.  However,
> given your recent admonishment of our efforts to formally secure Josephine's
> continued position with Matthews, we will now reconsider Josephine's long-term
> role with the Casket Division.

---

[7] Bowers testified that the golf outing was held on May 27, 2010.  Bowers Dep. 99:1-4.
[8] Batesville's vice president of sales, Doug Kunkel ("Kunkel"), testified that the potential hiring of Pesce and
Redmond was discussed at some point in April or May 2010.  ECF No. 518-21 at 4.  It is not clear whether those
discussions occurred before or after the golf outing.

ECF No. 484-25 at 7. The attempted "bribe" referenced in Doyle's letter appears to be an alleged offer from Steven Pontone ("Steven"), Harry's nephew, to pay Pesce $10,000.00 to service Harry's funeral home customers for Matthews.[9] *Id.* at 3, ¶ 16. Pesce described this alleged offer, which she later disclosed to Harry, as an attempt to secure the loyalties of Harry's customers even if Matthews ultimately decided to get "rid of him." *Id.* at 3-4, ¶ 17.

Scott vehemently denies that he played a role in steering Pesce or Redmond to Batesville. ECF No. 570 at 39-42. Under the present circumstances, however, a reasonable jury could infer that Scott was involved in the decisions of those two individuals to leave Matthews, York Group or Milso for Batesville. On June 18, 2010, Bowers forwarded a "Tactical Marketing Plan" to John Schutte ("Schutte") via email. BCC1_0050394-402. The document stated that the "plan overview" was to "[l]everage the relationships of Scott Pontone, Josephine Pesce, and Joseph Redmond in the Metropolitan Region to increase [Batesville's] customer awareness and market share." BCC1_0050396. Under the "message summary" heading, the document stated as follows:

> We're pleased to announce that Batesville has entered into a consultative relationship with Scott Pontone. As the former Vice President of Milso Industries and President of the Matthews Casket Division, Scott is widely known and respected in the funeral industry. He has spent his entire career in the funeral industry and has a true passion for his work. Scott will be working as a marketing consultant to Batesville in the Metropolitan area, leveraging his current and past relationships to open doors that will allow us to present Batesville's valuable proposition to funeral directors. Relationships are critical in funeral service and we believe Scott will effectively compliment [sic] our resources in helping grow our business in New York and the surrounding area. In addition we're also pleased to announce that Josephine Pesce and Joey Redmond have also joined our Team. Josephine has spent over 35 years with South Brooklyn and Milso Casket Company is [sic] various roles. Josephine will be an account specialist for Batesville Casket Company, we will use her knowledge and customer expertise to help us transition business quickly and efficiently. In this new role Josephine will report directly to the Regional Director. Joey has spent over 25 years with his

---

[9] Doyle's letter was apparently prepared in response to a letter authored by Harry in March 2010. ECF No. 518-6 at 5.

former employer where he managed the South Brooklyn service center. Prior to the sale to Matthews this was the largest service center that Milso operated. His knowledge of the customers and their buying habits will be critical to our success transitioning products.

BCC1_0050399.

Shortly after receiving the marketing plan, Schutte forwarded it to Doug Kunkel ("Kunkel"), who served as Batesville's Vice President of Sales. BCC1_0050394. In an email message to Kunkel, Schutte made the following observations:

Please review the Capri tactical plan. Please keep in mind the plan is based off of direction from Dibease and the requirements/expectations of Scott. You and I should probably discuss after you review due to a few structural changes that need your blessing.

BCC1_0050394. The language referring to the "requirements" and "expectations of Scott" suggests that he was involved in Batesville's marketing strategy *before* Pesce and Redmond started to work there. An internal message sent to Bowers referred to Batesville's acquisition of the "Pontone trio" as its "most important action step taken in decades." BCC1_0022975. It is worth noting that Michael DiBease ("DiBease"), Batesville's vice president of marketing, testified that Batesville had not even completed reference checks before hiring Pesce and Redmond. DiBease Dep. 151: 9-23. Although the contents of the "Capri[10] tactical plan" do not conclusively establish that Scott solicited the services of Pesce and Redmond on behalf of Batesville, they provide enough circumstantial evidence of inducement to permit a reasonable trier of fact to draw such an inference.[11] *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003).

---

[10] Mike DiBease ("DiBease"), Batesville's vice president of marketing, testified that the term "Capri" had been taken from the name of a vacation site frequented by Scott and his wife. DiBease Dep. 47: 5-15.
[11] Brian Walters ("Walters"), Matthews' general counsel, testified that Harry had verbally acknowledged Scott's coordination of the departures of Pesce and Redmond. ECF No. 518-7 at 5. Batesville maintains that Walters' testimony constitutes inadmissible hearsay that cannot be considered in connection with the pending motions for summary judgment. ECF No. 561 at 9. The court need not consider the admissibility of Walters' testimony at this

Matthews, York Group and Milso allege that Scott and Harry breached their contractual obligations by providing Batesville with "customer lists and customer information, trade secrets and other proprietary information." ECF No. 70 ¶¶ 128, 146. Peter Hounsell ("Hounsell") testified that, during "the few months leading up to" the departures of Pesce and Redmond, Pesce had been "extensively" shredding papers. ECF No. 518-27 at 3. Hounsell stated that, on April 19, 2010, Pesce asked him to "run reports on Harry's entire account base."[12] *Id.* at 10. Bartolacci testified that Harry had originally recommended Pesce for a promotion, but that he had suddenly changed his mind after learning that she would need to sign a non-competition agreement. ECF No. 518-20 at 19. In addition, Bartolacci stated that Harry had "changed significant contractual relationships with certain customers from a rebate program to an upfront discount program" and "prevented [him] from meeting with the most significant customer of that group." *Id.* at 9-10. Batesville's "Capri tactical plan" was apparently crafted to capitalize on "knowledge of the customers and their buying habits" provided by Scott, Pesce and Redmond. BCC1_0050399. Under the present circumstances, this "delicate construct of circumstantial evidence" could enable a reasonable jury to conclude that Scott and Harry misappropriated confidential information in violation of their respective employment agreements. *Greenberg v. Croydon Plastics Co., Inc.*, 378 F.Supp. 806, 814 (E.D.Pa. 1974).

In order to recover on their breach-of-contract claims, Matthews, York Group and Milso must establish that they suffered damages as a result of the breaches allegedly committed by Scott and Harry. *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994). The existing record provides sufficient evidence of damages to create a triable issue. The documentary evidence indicates that Batesville's sales to several regular Matthews customers

---

time, since the record independently contains sufficient circumstantial evidence to give rise to an inference that Scott played a role in recruiting Pesce and Redmond to Batesville.

[12] Pesce refused to participate in an exit interview after providing notice of her departure. YORK-0081817.

dramatically increased between July 1, 2010, and June 30, 2011. BCC1_0059068. Andrew Pontone ("Andrew") declared that several former customers had removed Matthews' products from their showrooms, and replaced them with products offered by Batesville, shortly after the departures of Pesce and Redmond. ECF No. 518-12 at 7, ¶ 18. Redmond testified that Scott, Pesce and he had been "instrumental" in getting some customers to purchase products from Batesville rather than from Matthews. ECF No. 518-26 at 18. Thomas Pontone ("Thomas") testified that Matthews had been forced to offer other customers higher discounts and better rebates in order to retain their business. ECF No. 518-28 at 15. He stated that Batesville had been offering funeral homes slightly higher discounts than those previously offered by Matthews, leading him to believe that Batesville's sales representatives had been provided with confidential information about the terms of Matthews' deals with those customers. *Id.* at 11-12. In his declaration, Andrew stated that Matthews had been forced to offer increased discounts to four of Harry's former customers in order to retain their business. ECF No. 518-12 at 8-9, ¶ 22.

The court acknowledges that several funeral home operators have submitted declarations stating that their decisions to purchase products from Batesville rather than from Matthews were entirely attributable to factors other than the actions of Scott, Harry, Pesce or Redmond. ECF No. 484-7 at 7, ¶ 39; ECF No. 484-8 at 6, ¶ 28; ECF No. 484-9 at 5-6, ¶ 27; ECF No. 484-10 at 8, ¶ 31; ECF No. 484-11 at 4, ¶ 21; ECF No. 484-12 at 5-6, ¶ 30. In the present context, however, those declarations do not preclude a finding that strategic information improperly provided to Batesville personnel played a determinative role in causing the customers to deal with Batesville rather than with Matthews. The causal relationship between a contractual breach and the damages suffered by the non-breaching party presents a question of fact for the jury. *Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., Inc.*, 429 F.Supp.2d 582, 610-611 (S.D.N.Y.

2006).  The motion for summary judgment filed by Scott, Harry and PCC will be denied with

respect to the breach-of-contract claims asserted against Scott and Harry.  ECF No. 70 ¶¶ 123-

32, 141-50.

        **C.**      **The Breach-of-Fiduciary Duty Claim**

Matthews, York Group and Milso allege that Harry breached certain fiduciary duties in

connection with the departures of Pesce and Redmond and the alleged misappropriation of

confidential information.  ECF No. 70 ¶¶ 151-57.  Harry argues that this claim should be

dismissed under the "gist of the action doctrine."  ECF No. 477 at 16.  That doctrine, which is

grounded in Pennsylvania law, generally precludes plaintiffs from characterizing ordinary

breach-of-contract claims as tort claims.  *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d

10, 14 (Pa.Super.Ct. 2002).  "[T]he important difference between contract and tort actions is that

the latter lie from the breach of duties imposed as a matter of social policy while the former lie

for the breach of duties imposed by mutual consensus."  *Redevelopment Auth. of Cambria Cnty.

v. Int'l Ins. Co.*, 685 A.2d 581, 590 (Pa.Super.Ct. 1996)(*en banc*).  The "gist of the action

principle" can be applied even where the misconduct alleged is fraudulent in nature.  *Pediatrix

Screening, Inc. v. Telechem Int'l, Inc.*, 602 F.3d 541, 548 (3d Cir. 2010).

The parties stipulated that the breach-of-fiduciary duty claim asserted against Harry is

governed by Delaware law.  ECF No. 159 at 2.  Consequently, the "gist of the action doctrine"

recognized in Pennsylvania cannot be applied as such.  Nevertheless, Delaware recognizes "the

primacy of contract law over fiduciary law."  *Wood v. Baum*, 953 A.2d 136, 143, n.23 (Del.

2008).  In disputes arising from obligations addressed in contractual provisions, "any fiduciary

claims arising out of the same facts that underlie [those] obligations [are] foreclosed as

superfluous."  *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010).  Section 1.07 of Harry's

employment agreement specifically provided that he "owe[d] a fiduciary duty of loyalty to act at all times in the best interests of the Company." ECF No. 480-2 at 8. That provision prohibited Harry from appropriating York Group's "business opportunities" for his "own benefit." *Id.* For this reason, any alleged breaches of Harry's fiduciary duties are subsumed by the contract, which is governed by New York law. *Id.* at 15. The breach-of-contract claims asserted against Harry are based, at least in part, on Section 1.07 of the agreement. ECF No. 70 ¶ 147. Since genuine issues of material fact exist about whether Harry breached his contractual obligations, those claims remain viable. Under Delaware law, however, the common-law breach-of-fiduciary-duty claim must be dismissed as superfluous in light of the contractual claims. *Nemec*, 991 A.2d at 1129. With respect to the breach-of-fiduciary duty claim, summary judgment will be entered in favor of Harry. ECF No. 70 ¶¶ 151-57.

### D. The Tortious Interference with Contractual Relations Claims

Matthews, York Group and Milso assert tortious interference with contractual relations claims against Scott, Harry and Batesville. ECF No. 70 ¶¶ 133-40, 158-73. A party cannot be injured by the application of a particular jurisdiction's law if that law "is not in conflict with that of any other [interested] jurisdiction." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985). Consequently, an extensive choice-of-law analysis is unnecessary when no difference exists between the laws of the competing jurisdictions. *Pacific Emp'rs Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 432 (3d Cir. 2012). The parties agree that no difference exists between the laws of Pennsylvania and New York with respect to the tort of interfering with existing contractual relations. ECF No. 159 at 2-3. Therefore, the court may interchangeably refer to the laws of those jurisdictions. *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 229 (3d Cir. 2007).

Pennsylvania recognizes "an action in tort for an intentional, unprivileged interference with contractual relations." *Birl v. Phila. Elec. Co.*, 167 A.2d 472, 474 (Pa. 1960). To sustain a cause of action for "intentional interference with business relations" under Pennsylvania law, a plaintiff must demonstrate that: (1) there was an existing contractual relationship between the plaintiff and a third party; (2) the defendant induced the third party to breach his or her contractual obligations; (3) the defendant's conduct was not privileged; and (4) the breach caused the plaintiff to suffer pecuniary loss. *Al Hamilton Contracting Co. v. Cowder*, 644 A.2d 188, 191 (Pa.Super.Ct. 1994). "The third element requires proof that the defendant's actions were *improper* under the circumstances presented." *Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 98 (Pa.Super.Ct. 2009)(emphasis in original). Pennsylvania law essentially requires a plaintiff to establish, as a part of his or her *prima facie* case, that "the defendant's conduct was not justified." *Triffin v. Janssen*, 626 A.2d 571, 574 n.3 (Pa.Super.Ct. 1993). In determining whether an actor's conduct is "improper," a court must consider: "(a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the others with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties." *Id.* (quoting the Restatement (Second) of Torts § 767). A plaintiff who maintains a successful claim under this theory may be entitled to an award of punitive damages. *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 500 F.Supp. 1312, 1322 (W.D.Pa. 1980).

The New York Court of Appeals has declared that a defendant must have knowledge of a plaintiff's contract with a third party in order tortiously to procure a breach thereof. *Lama Holding Co. v. Smith Barney, Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996). "[W]here there is an

existing, enforceable contract and a defendant's deliberate indifference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior."[13] *NBT Bancorp, Inc. v. Fleet/Norstar Fin. Group, Inc.*, 664 N.E.2d 492, 496 (N.Y. 1996). A claim for tortious interference with a contractual relationship cannot normally be asserted against a party to that relationship. *Albert v. Loksen*, 239 F.3d 256, 274-275 (2d Cir. 2001).

Scott and Harry were obviously parties to their respective employment agreements. The interference claims asserted against them are grounded in an allegation that they each interfered with the contractual obligations owed by the other. ECF No. 70 ¶¶ 133-40, 158-65. The record clearly establishes that Scott and Harry were each aware of the other's contractual obligations. Indeed, the agreement governing the terms of Scott's employment specifically referred to Harry's status as the president.[14] ECF No. 470-1 at 2-3. Scott joined Harry's 2007 lawsuit challenging York Group's alleged violations of the asset purchase agreement. ECF No. 191-2. Neither individual could be credibly described as a stranger to the other's employment agreement.

As discussed earlier, genuine issues of material fact exist about whether Scott and Harry breached their respective employment agreements, and whether pecuniary losses resulted from the alleged breaches. The remaining questions center on the issues of inducement and impropriety. *Al Hamilton*, 644 A.2d at 191; *Walnut Street*, 982 A.2d at 98. Contrary to the assertions of Scott and Harry, the existing record contains sufficient evidence from which a

---

[13] Where a claim is "based on interference with a nonbinding relationship," the plaintiff must ordinarily show that the defendant's conduct "amount[ed] to a crime or an independent tort." *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004). This heightened showing of impropriety is needed to assert a claim for tortious interference with *prospective* contractual relations, where "the balance of interests is different." *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 867 N.E.2d 381, 384 (N.Y. 2007).

[14] Scott was designated as Harry's successor in the event that Harry did not complete his term. ECF No. 470-1 at 3.

reasonable trier of fact could infer that each of them facilitated breaches of the other's contractual obligations.

The document discussing Batesville's "Capri tactical plan" could give rise to an inference that Scott was involved in the procurement and disclosure of confidential information available to Pesce and Redmond. BCC1_0050394-402. According to Hounsell, Pesce was "run[ning] reports on Harry's entire account base" just two months prior to her defection to Batesville. ECF No. 518-27 at 10. Bartolacci testified that Harry had resisted Pesce's receipt of a promotion after learning that Pesce would be asked to sign a non-competition agreement. ECF No. 518-20 at 19. Andrew declared that, during the months immediately preceding June 2010, Harry had actively prevented other Matthews salespersons from communicating with "his" customers. ECF No. 518-12 at 4, ¶ 7. Although Scott was the member of the Pontone family specifically affiliated with Batesville, Andrew stated that Harry had been the one with "close relationships" with the customers who were switching their business from Matthews to Batesville. *Id.* at 5, ¶ 9. Scott, Pesce and Redmond all started to work for Batesville in June 2010. ECF No. 587 at 34, ¶ 65, 82, ¶ xxxvii. Batesville's internal documents suggest that, shortly thereafter, Harry may have been involved in Scott's efforts to steer business from Matthews to Batesville. Frank Connelly ("Connelly"), a strategic account specialist for Batesville, forwarded the following comments to Bowers on July 19, 2010:

> Comments: Vicki Thompson-Simmions [sic] asked about the hiring of Scott Pontone. I advised Vicki that Scott Pontone wanted to get back into the casket business. Scott stated after careful review of all the casket companies Batesville was in the best position to provide the funeral service industry with the right products and services. Scott states Batesville offers the best products, technology and is forward thinking to take on the challenges and demands in todays [sic] funeral service industry. Vicki was very happy to see Scott Pontone join us. Vicki and her farther [sic] will be meeting with Harry Pontone to discuss the Scott move. Vicki thinks that this will be an opportunity to move all of their business to Batesville. Will follow up and advised.

BCC1_0022994-95.  Andrew asserted that he had personally seen Harry solicit customers for

Batesville on September 23, 2010.  ECF No. 518-12 at 10, ¶ 27.  Given the "unduly suggestive"

timing of these events, a reasonable jury could infer that Scott and Harry were mutually involved

in concerted actions constituting corresponding violations of their respective employment

agreements.[15]  *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 369 (3d Cir. 2008)(discussing

the importance of "temporal proximity," and the inferences arising therefrom, in the "procedural

posture" of summary judgment).

     The remaining question is whether the activities allegedly engaged in by Scott and Harry

could be reasonably deemed to be improper under the circumstances presented.  *Walnut St.*, 982

A.2d at 98.  Scott and Harry vaguely contend that they did not engage in "improper" conduct.

ECF No. 477 at 38-39.  The existing record, however, contains evidence suggesting that they

were mutually engaging in conduct violative of their contractual obligations for the purpose of

steering customers from Matthews to Batesville.  BCC1_0022994-95.  When the Pontones sold

their family business to Matthews, they gave up the right to solicit the business of their former

customers to Matthews' detriment.  *Bessemer*, 949 N.E.2d at 468-70.  Although Scott and Harry

were released from New York's "implied covenant" against solicitation by the operation of their

respective employment agreements, they remained subject to additional restrictions designed to

safeguard Matthews' business interests.  ECF No. 28-3 at 4; ECF No. 470-1 at 14-15; ECF No.

480-2 at 13-14.  To the extent that Scott and Harry induced or facilitated mutual breaches of their

corresponding employment agreements, their actions could be reasonably characterized as

---

[15] The court acknowledges that some of this evidence is contradicted.  Vicki Thompson-Simmons, the assistant manager of the Lawrence H. Woodward Funeral Home, Inc., submitted a declaration denying that her decision to purchase products from Batesville had been influenced by the actions of Scott, Harry, Pesce or Redmond.  ECF No. 484-12 at 5-6, ¶ 30.  Scott, Harry and Batesville remain free to rely on such countervailing evidence at trial.  At this stage, however, the evidence must be viewed in the light most favorable to Matthews, York Group and Milso. *Thompson v. Wagner*, 631 F.Supp.2d 664, 681-682 (W.D.Pa. 2008).

"improper" under the present circumstances. *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 867 N.E.2d 381, 384 (N.Y. 2007)(remarking that a defendant's "mere status" as the "plaintiff's competitor" does not provide "a legal or financial stake in the breaching party's business" sufficient to excuse the "inducement of a breach of contract"). Their motion for summary judgment will be denied with respect to the tortious interference with contractual relations claims. ECF No. 70 ¶¶ 133-40, 158-65.

Matthews, York Group and Milso also assert tortious interference with contractual relations claims against Batesville. ECF No. 70 ¶¶ 166-73. Batesville moves for summary judgment with respect to those claims. ECF No. 462. The crux of Batesville's argument is that Matthews did not lose any business as a result of the tortious conduct alleged in the amended complaint. ECF No. 475 at 13-21. For the reasons discussed earlier, that argument cannot carry the day at this juncture. The record indicates that Batesville's sales to Harry's former customers significantly increased during the year following its hiring of Scott, Pesce and Redmond. BCC1_0059068. Redmond testified that Scott, Pesce and he had been "instrumental" in securing that business for Batesville. ECF No. 518-26 at 18. Furthermore, Batesville's suggestion that Pesce was employed by Matthews (rather than by York Group or Milso) provides no basis for the entry of summary judgment. ECF No. 475 at 10-11. The record contains evidence supporting a finding that Pesce was initially employed by Milso, and later by York Group, during the period of time postdating the acquisition. ECF No. 518-94 at 3, ¶ 3; ECF No. 518-97 at 2. The documentary record indicates that Batesville may have played a direct role in procuring the services of Scott and Pesce for the specific purpose of utilizing information obtained by them in connection with their prior duties with Matthews.[16] BCC1_0050394-402.

---

[16] The court previously dismissed the tortious interference with contractual relations claim against Batesville pertaining to Scott's alleged recruitment of Redmond. ECF No. 177 at 33-34. Consequently, the claims against

Telephone records confirm that Scott was frequently communicating with Pesce and Batesville officials on the date of Pesce's departure. SP00669-71. Given the suggestive timing of the events in question, a reasonable jury could conclude that Batesville induced Scott's alleged breach of the non-solicitation provision.

Unlike Scott, Harry was still subject to a non-competition provision during the summer of 2010. ECF No. 480-2 at 13. The message forwarded by Connelly to Bowers on July 19, 2010, suggests that Batesville may have knowingly utilized Harry's relationships with Matthews' customers in order to procure their business. BCC1_0022994-95. Andrew declared that he had "witnessed Harry solicit customers on behalf of Batesville" on September 23, 2010. ECF No. 518-12 at 10, ¶ 27. The employment agreements define the term "Confidential Information" broadly enough to include "sales methods, sales proposals, customers and prospective customers, [the] identit[ies] of customers and prospective customers, [the] identit[ies] of key purchasing personnel in the employ of customers and prospective customers, [and] the amount or kind of purchases from the Company." ECF No. 470-1 at 12; ECF No. 480-2 at 11. The document discussing the "Capri tactical plan" indicates that Batesville was trying to capitalize on the "knowledge and customer expertise" of Scott, Pesce and Redmond in order to take business from Matthews. BCC1_0050394, 99.

The record contains sufficient circumstantial evidence to create an inference that Batesville induced Scott and Harry to breach their respective employment contracts. Batesville's attempt to secure summary judgment on the ground that no direct evidence of inducement has been presented is unavailing. ECF No. 475 at 24. The United States Supreme Court "ha[s] never questioned the sufficiency of circumstantial evidence in support of a criminal conviction,

Batesville relate only to induced disclosures of contractually-protected information and Scott's alleged recruitment of Pesce. ECF No. 475 at 9-12.

even though proof beyond a reasonable doubt is required." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). In the present civil context, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Rogers v. Missouri Pacific R.R. Co.*, 352 U.S. 500, 508 n.17 (1957).

The only remaining question is whether Batesville had knowledge of the employment agreements at the time of its alleged interference. *Lama*, 668 N.E.2d at 1375. It is undisputed that Batesville had access to Scott's amended agreement. Batesville maintains that it was never "aware of the particular terms of Harry's agreement." ECF No. 587 at 45-46, ¶ 82. Nevertheless, the New York Court of Appeals has specifically held that a defendant can tortiously interfere with the performance or execution of a contract even if he or she is "totally unaware of" and "indifferent to" the "legal particulars of that contract." *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445, 450 (N.Y. 1980). Matthews, York Group and Milso are not required to demonstrate that Batesville "had perfect or precise knowledge of the terms and conditions of the contracts [at] issue." *Don King Productions, Inc. v. Douglas*, 742 F.Supp. 741, 775 (S.D.N.Y. 1990). It suffices for them to show that Batesville personnel knew that the conduct allegedly induced was contrary to the contractual obligations of Scott and Harry. *Hidden Brook Air, Inc. v. Thabet Aviation Int'l, Inc.*, 241 F.Supp.2d 246, 279 (S.D.N.Y. 2002). Internal business documents indicate that Batesville officials were aware of both employment agreements as early as August 2009. ECF No. 518-38 at 4. For these reasons, Batesville's motion for summary judgment will be denied with respect to the tortious interference with contractual relations claims. ECF No. 70 ¶¶ 166-73.

### E. The Unjust Enrichment Claims

Matthews, York Group and Milso assert unjust enrichment claims against Scott and Batesville.[17] ECF No. 70 ¶¶ 191-96. The parties agree that no differences relating to these claims exist between the laws of Pennsylvania and New York. ECF No. 159 at 3. Scott and Batesville move for summary judgment with respect to the unjust enrichment claims. ECF Nos. 462 & 472.

An unjust enrichment claim requires a showing that 1) the plaintiff conferred a benefit upon the defendant, 2) the defendant was aware of the benefit, and 3) the defendant's acceptance of the benefit occurred under circumstances in which "it would be inequitable for him [or her] to retain the benefit without payment of the value thereof." *Fabral, Inc. v. B&B Roofing Co., Inc.*, 773 F.Supp.2d 539, 549 n.10 (E.D.Pa. 2011). "Where unjust enrichment is found, the law implies a contract between the parties pursuant to which the plaintiff must be compensated for the benefits unjustly received by the defendant." *Styer v. Hugo*, 619 A.2d 347, 350 (Pa.Super.Ct. 1993). "[T]he doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract." *Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006). Although a plaintiff need not be in privity with a defendant in order to recover under a theory of unjust enrichment, "a claim will not be supported if the connection between the parties is too attenuated." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1111 (N.Y. 2011).

---

[17] The claims purport to be brought against all four defendants. Nonetheless, the amended complaint does not allege that PCC received a benefit at the expense of Matthews, York Group or Milso. ECF No. 70 ¶ 193. Based on representations made by the plaintiffs' counsel during a hearing conducted on October 27, 2011, the court does not understand the plaintiffs to argue that PCC is itself liable under a theory of unjust enrichment. ECF No. 177 at 80-81. Their brief in opposition to the defendants' motion for summary judgment addresses the issue of unjust enrichment only in relation to Scott. ECF No. 510 at 31-33. To the extent that the plaintiffs intended to assert unjust enrichment claims against PCC, those claims are deemed to have been abandoned. *Glenn v. Raymour & Flanigan*, 832 F.Supp.2d 539, 547 (E.D.Pa. 2011). The unjust enrichment claims against Harry were already dismissed. ECF No. 177 at 73-74.

Since the breach-of-contract claims against Scott are based on alleged violations of express contractual provisions, the terms of those provisions define the "rights, duties, and expectations" of all relevant parties. *Curley v. Allstate Ins. Co.*, 289 F.Supp.2d 614, 619-21 (E.D.Pa. 2003). Because there is a contract, Matthews, York Group and Milso cannot proceed against Scott under the guise of enforcing a "fictional contract" existing merely as "a form of the remedy of restitution." *Crawford's Auto Center, Inc. v. Pennsylvania State Police*, 655 A.2d 1064, 1070 (Pa.Commw.Ct. 1995). Scott is entitled to summary judgment with respect to the unjust enrichment claims asserted against him because those are superfluous.[18] ECF No. 70 ¶¶ 191-96.

Given that Batesville had no contractual relationship with Matthews, York Group or Milso, the unjust enrichment claims asserted against it are "not categorically barred." *Barbagallo*, 820 F.Supp.2d at 447. Section 43 of the Restatement (Third) of Restitution and Unjust Enrichment renders "[a] person who obtains a benefit . . . in breach of a fiduciary duty . . . or . . . in consequence of another's breach of such a duty . . . liable in restitution to the person to whom the duty is owed." Restatement (Third) of Restitution and Unjust Enrichment § 43(a), (c) (2011). This court has already predicted that § 43 would be adopted and applied by the Pennsylvania Supreme Court. ECF No. 73-77.

Delaware recognizes "the primacy of contract law over fiduciary law." *Wood*, 953 A.2d at 143 n.23. Since Harry's fiduciary obligations to Matthews, York Group and Milso were subsumed by his employment contract through the operation of Section 1.07, the common-law breach-of-fiduciary-duty claim must be dismissed. *Nemec*, 991 A.2d at 1129. The contractual

---

[18] With respect to Scott and Harry, the unjust enrichment claims were included in the amended complaint solely as alternatives to the breach-of-contract claims. ECF No. 70 ¶ 196. The court already explained that the plaintiffs cannot proceed against Scott with concurrent breach-of-contract and unjust enrichment claims. ECF No. 177 at 80-82.

claims arising from Harry's alleged fiduciary breaches, however, remain viable. As explained earlier, genuine issues of material fact exist about whether Batesville profited from alleged breaches of Harry's fiduciary obligations.[19] Therefore, the unjust enrichment claims asserted against Batesville can proceed to trial. ECF No. 177 at 77. Batesville's motion for summary judgment will be denied with respect to those claims.[20] ECF No. 70 ¶¶ 191-96.

F.     The Unfair Competition Claims

Matthews, York Group and Milso assert common-law unfair competition claims against Scott, Harry, PCC and Batesville. ECF No. 70 ¶¶ 185-90. Each defendant moves for summary judgment with respect to the unfair competition claims. ECF Nos. 462 & 472. The parties stipulated that those claims are governed by New York law. ECF No. 159 at 3. Therefore, the court will examine the unfair competition claims in accordance with the principles applicable under the common law of New York.

The common-law tort of "unfair competition" has been described as an "adaptable and capacious" tort encompassing a wide variety of "illegal practices." *Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broadcasting Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982). "New York courts have recognized that unfair competition is broadly construed to include misappropriation of a competitor's property, even if such property does not qualify as a trade secret." *Linko, Inc. v. Fujitsu Ltd.*, 230 F.Supp.2d 492, 503 (S.D.N.Y. 2002). "Although

---

[19] Since § 43 classifies the remedy as a form of restitution, an unjust enrichment claim thereunder can be asserted only by a plaintiff who has sustained a "financial loss." *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 415 n.3 (3d Cir. 2013). For the reasons discussed earlier, a reasonable jury could conclude that the contractual breaches alleged in this case caused Matthews, York Group and Milso to lose business.

[20] In order to prevail at trial on a theory of unjust enrichment, Matthews, York Group and Milso cannot simply demonstrate that information wrongfully provided by Pesce and Redmond enabled Batesville to obtain unjust profits. Since Pesce and Redmond were merely at-will employees with no employment contracts, information misappropriated solely by them cannot render Batesville liable for equitable restitution. *Barbagallo v. Marcum LLP*, 820 F.Supp.2d 429, 448 (E.D.N.Y. 2011). Matthews, York Group and Milso must directly link their losses (and the corresponding benefits conferred upon Batesville) to breaches of Harry's fiduciary duties. Restatement (Third) of Restitution and Unjust Enrichment § 43 (2011).

claims of unfair competition often allege misappropriation of trade secrets or ideas, a claim may be based on misappropriation of information not rising to that level, such as client lists, internal company documents, and business strategies." *Berman v. Sugo LLC*, 580 F.Supp.2d 191, 209 (S.D.N.Y. 2008). "The law of unfair competition" is something that "must be applied flexibly," and the availability of relief in a given dispute "must be determined by an appraisal of the particular circumstances of the case." *Flexitized, Inc. v. Nat'l Flexitized Corp.*, 214 F.Supp. 664, 675 (S.D.N.Y. 1963). The common law of New York provides remedies in tort for a broad range of "commercial immorality." *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001).

The New York Court of Appeals has declared that "a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987). Although this legal duty may be "dependent upon the contract" in some way, it must not constitute an element thereof. *Id.* at 194. The unfair competition claims asserted against Scott and Harry appear to be based primarily on the alleged "misappropriation of . . . customer lists, requirements, and other confidential information." ECF No. 70 ¶ 186. The wrongful disclosure of such information, however, was independently prohibited under the applicable employment contracts. ECF No. 470-1 at 12-13; ECF No. 480-2 at 11-12. Matthews, York Group and Milso argue that their unfair competition claims are broadly based on conduct extending beyond the misappropriation of confidential information. ECF No. 510 at 28-29. Nevertheless, they point to no wrongful conduct engaged in by Scott and Harry that would not have constituted violations of their respective employment agreements. *Id.* Since the unfair competition claims are not based on alleged violations of legal duties existing independently of the contracts, Scott and Harry are

entitled to summary judgment with respect to those claims because those claims are superfluous.[21] *Clark-Fitzpatrick*, 516 N.E.2d at 194 (remarking that "[m]erely charging a breach of a 'duty of due care,' employing language familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim").

The unfair competition claims asserted against Batesville rest on a different premise. Unlike Scott and Harry, Batesville has no contract with Matthews, York Group or Milso. Hounsell testified that Pesce had requested information about "Harry's entire account base" just two months before her defection to Batesville. ECF No. 518-27 at 10. The "Capri tactical plan" was designed to utilize Pesce's "knowledge and customer expertise to help [Batesville] transition business quickly and efficiently." BCC1_0050399. In his declaration, Andrew characterized "customer preferences, customer tastes, customer likes and dislikes, requisite inventory levels for customers, customer discount arrangements, customer rebate arrangements, consignment agreements, showroom preferences and arrangements, personal and company financial information, and intimate personal information" as "confidential information." ECF No. 518-12 ¶ 30. An unfair competition claim can arise from the "misappropriation of client lists, internal company documents, and business strategies." *Barbagallo*, 820 F.Supp.2d at 447. The misappropriation of a business' "distribution list of customers and subdistributors" can give rise to an unfair competition claim even if the information contained therein does not include trade secrets. *Milton Abeles, Inc. v. Farmers Pride, Inc.*, 603 F.Supp.2d 500, 503 (E.D.Pa. 2009). Because the record contains evidence giving rise to an inference that Pesce "wrongfully" appropriated confidential business information for Batesville's benefit, a reasonable trier of fact

---

[21] The tortious interference with contractual relations claims are based on allegations that Scott and Harry tortiously induced one another to violate the contracts, which distinguishes those claims from the unfair competition claims. ECF No. 70 ¶¶ 136, 161. The obligation to refrain from inducing another person to violate his or her contract is a legal duty existing independent of the contract itself. *Barbagallo v. Marcum LLP*, 820 F.Supp.2d 429, 444 (E.D.N.Y. 2011).

could conclude that Batesville engaged in unfair competition. *Paz Systems, Inc. v. Dakota Group Corp.*, 514 F.Supp.2d 402, 409 (E.D.N.Y. 2007). The evidence suggesting that customers were transitioned to Batesville could support a finding that Matthews, York Group and Milso suffered "special damages." *Barbagallo*, 820 F.Supp.2d at 447.

An unfair competition claim can also arise where the misappropriation of another's "labors and expenditures" is likely to confuse or deceive purchasers about the origin of certain products. *Jeffrey Milstein, Inc. v. Gregor, Lawlor, Roth, Inc.*, 58 F.3d 27, 34-35 (2d Cir. 1995). "A likelihood of confusion exists when consumers are likely to assume that a product is associated with a manufacturer other than its actual source because of similarities between the related goods." *Forschner Group, Inc. v. Arrow Trading Co., Inc.*, 124 F.3d 402, 408 (2d Cir. 1997). The unfair competition claim asserted against PCC appears to be grounded in an allegation that its use of the "Pontone" name is likely to mislead potential customers into believing that it is affiliated with Matthews, which continues to employ several members of the Pontone family. ECF No. 70 ¶ 186. The court previously dismissed the Lanham Act claims against PCC on the ground that its use of the "Pontone" name was not likely to cause confusion under the circumstances at issue. ECF No. 141 at 17-21. That line of reasoning applies with equal force to the common-law unfair competition claims based on PCC's name. *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1048 (2d Cir. 1992). With respect to the unfair competition claims contained in the amended complaint, the court will grant the motion for summary judgment filed by Scott and Harry because those claims are superfluous. The court will grant the motion for summary judgment filed by PCC and deny the motion for summary judgment filed by Batesville. ECF No. 70 ¶¶ 185-90.

### G. The Tortious Interference with Prospective Economic Advantage Counterclaims

Batesville, Scott and PCC assert counterclaims against Matthews, York Group and Milso for tortious interference with prospective economic advantage. ECF No. 236 ¶¶ 68-81; ECF No. 333 ¶¶ 203-10. These claims are based on allegations that Matthews, York Group and Milso acted to interfere with the business of Batesville and PCC by initiating this action and badmouthing Scott to potential customers. *Id.* In order to establish actionable counterclaims, Batesville, Scott and PCC must demonstrate that: (1) they were engaged in business relations with other parties; (2) Matthews, York Group and Milso interfered with those business relations; (3) Matthews, York Group and Milso either "acted for the sole purpose of harming" Batesville, Scott and PCC or "used dishonest, unfair, or improper" tactics; and (4) Batesville, Scott and PCC suffered injuries to their business relationships. *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000). Improper tactics, or "wrongful means," include the use of "physical violence, fraud or misrepresentation," the initiation of "civil suits and criminal prosecutions," and the intentional deployment of "economic pressure." *Guard-Life*, 406 N.E.2d at 449.

Batesville and PCC entered into a consulting agreement on June 24, 2010. SP00362-SP00404. The agreement classified PCC as an "independent contractor" of Batesville and specifically provided that the parties were not establishing an employment or agency relationship. SP00364. Pursuant to the terms of the agreement, Batesville was to utilize PCC to market its burial products to funeral homes that were not existing Batesville customers. SP00362. The agreement provided that PCC was to be compensated by the payment of a monthly finder's fee for each "qualified sale." SP00364. PCC agreed to assign Scott, and no

other employee, to provide services for Batesville. SP00364. The contract contained an exception permitting PCC to utilize Bobby Wynn ("Wynn") to market Batesville's products in Texas. SP00364. The agreement was executed just two days after Pesce and Redmond started to work for Batesville. ECF No. 587 at 82, ¶ xxxvii.

Michael Baklarz ("Baklarz"), the vice president and general manager of sales and distribution for Matthews' Casket Division, learned about the consulting agreement on June 28, 2010. ECF No. 548-17 at 3. The information was apparently relayed to Baklarz by Glenn Dunn ("Dunn"), who had spoken with Wynn by telephone. *Id.* Baklarz sent an email to Thomas, Andrew, Doyle and Stephen Duffy ("Duffy") about the situation. *Id.* After receiving a reply from Thomas, Baklarz sent the four recipients a message reading as follows:

> From what Bobby has shared with Glenn, anyone not buying from Batesville is open to Bobby and Scott. We are having a call in the morning with the sales force to make sure all are aware. Also I really believe Scott has set up a separate company and yes, it is strange, that this is the arrangement Batesville has established. Could they have contracted with Scott as an Independent Contractor? We will hear more shortly
>
> Also Bobby told Glenn he would no longer be selling Chinese caskets. I will keep you posted. We have calls to make with the Funeral Homes of Texas—Dr. Mo and a few others.

*Id.* at 2. In a response sent to Baklarz, Andrew, Doyle and Duffy at 5:06 p.m. on June 28, 2010, Thomas made the following comments:

> Let's see if we can see what the name of his company is, very interesting Batesville wanted nothing to do with Bobby so Scott had to open a company to keep him employed. Should be easy to put out of business . . . Mike, let's put them out of bizz.

*Id.* Batesville, Scott and PCC rely on this exchange as a basis for asserting that Matthews, York Group and Milso were disparaging them while communicating with prospective customers. ECF No. 512 at 14.

Peter M. Ferris ("Ferris"), director of market development for Matthews' International Casket Division, sent an email to several Matthews officials on July 15, 2010. ECF No. 466-5 at 2. A phrase reading "Brooklyn Issues Confidential" appeared in the subject line of the message. *Id.* The contents of the message included telephone numbers for four funeral homes. *Id.* Those numbers were followed by the following statements:

> Key Lines to Use
>
> Don't bash Harry
>
> Scott has torn his family apart
>
> "We could have sold our company to Batesville for more money, but we couldn't have done that to our customers and employees" words from Scott Pontone.

*Id.* This information was prefaced by a statement suggesting that the referenced "items" had been discussed one day earlier. *Id.*

On the evening of August 8, 2010, Steven emailed Thomas a message reading as follows:

> Tom I have a good idea we should sue scott the day harry leaves for italy so it ruins his whole fukin trip like he ruined our whole summer that scum bag, plus he won't call any customers from italy he will be all fuked up.

ECF No. 548-16 at 2. This action was commenced against Scott and Batesville on August 16, 2010. ECF No. 1. On February 28, 2011, Matthews, York Group and Milso amended their complaint and added Harry and PCC as defendants. ECF No. 70. In a memorandum to Matthews' board of directors dated April 13, 2011, Bartolacci made the following remarks:

> Our litigation against Batesville and Scott/Harry Pontone has effectively stymied Batesville's effort to utilize the Pontones to convert business and poach our employees. Although this will be a protracted legal matter which has and will continue to cost us significant legal fees, we continue to believe that this lawsuit is in the long-term best interest of the Company.

ECF No. 548-18 at 3. Batesville, Scott and PCC maintain that these messages suggest that Matthews, York Group and Milso improperly took actions to interfere with their business opportunities. ECF No. 512 at 9-13; ECF No. 522 at 35-36.

Matthews, York Group and Milso argue that they are not amenable to suit for tortious interference with prospective business relations because they had an economic interest in securing or maintaining the business of the relevant funeral homes. ECF No. 464 at 8-9. Batesville refutes that argument by relying on the following passage in *NBT Bancorp, Inc. v. Fleet-Norstar Financial Group, Inc.*, 628 N.Y.S.2d 408, 410 (N.Y. App. Div. 1995):

> To successfully oppose a motion for summary judgment on a cause of action for tortious interference with prospective business relations, plaintiffs must establish that defendants engaged in the use of wrongful or unlawful means to secure a competitive advantage over plaintiffs, or that defendants acted for the sole purpose of inflicting intentional harm on plaintiffs.

*NBT Bancorp*, 628 N.Y.S.2d at 410. According to Batesville, "the use of wrongful or unlawful means to secure a competitive advantage" is actionable even if a defendant does not act for the "sole purpose of inflicting intentional harm" on a competitor. ECF No. 512 at 16. Phrases "connected by a disjunctive" are ordinarily "given separate meanings." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979). The court agrees with Batesville's position that the counterclaims are not infirm simply because Matthews, York Group and Milso may have acted to further their own economic interests. Conduct that is "wrongful" remains "independently actionable" and "is not protected by the competitor's privilege." *Smithkline Beecham Corp. v. Apotex Corp.*, 383 F.Supp.2d 686, 704 (E.D.Pa. 2004).

Matthews, York Group and Milso contend that the statements contained in Ferris' email were never conveyed to prospective customers of Batesville, Scott and PCC. ECF No. 464 at 7-8. Nonetheless, the record contains evidence suggesting that statements akin to those referenced

in the email were repeated to customers. Andrew Lanza ("Lanza") is the owner and director of the Colonial Funeral Home in Staten Island, New York. ECF No. 484-17 ¶ 1. Andrew testified that he had "laid out the whole scenario" during a conversation with Lanza. ECF No. 548-21 at 9-10. That statement from Andrew came in response to an inquiry about whether he had accused Scott of "breaking apart" the Pontone family. *Id.* Steven Kanowitz ("Kanowitz"), a Matthews' customer, testified that Michael Pontone ("Michael") had stated that the members of the Pontone family working for Matthews were no longer talking to Scott. ECF No. 517-17 at 9-10. Baklarz's email of June 28, 2010, indicates that Matthews' officials were planning to make the "sales force" aware of Scott's activities. ECF No. 548-17 at 2. Ferris' comment about Scott's "ha[ving] torn his family apart" appeared under the phrase "Key Lines to Use." ECF No. 466-5 at 2. A reasonable trier of fact may infer from this evidence that members of Matthews' sales force followed their instructions and proceeded to disparage Scott in the presence of customers. *Boston Excelsior Co. v. Sweatt*, 229 F. 321, 324 (1st Cir. 1916).

In order to proceed with their tortious interference with prospective economic advantage counterclaims, Batesville, Scott and PCC must demonstrate that they suffered damages because of the alleged interference. *Nadel*, 208 F.3d at 382. On the basis of the existing record, a reasonable jury could conclude that the "wrongful" interference relied upon by Batesville, Scott and PCC caused them to incur losses. Richard Adlman ("Adlman") testified that at least one funeral home was refusing to do business with Scott due to a belief that he had "torn [his] family apart." ECF No. 517-16 at 7. Bartolacci's memorandum of April 13, 2011, suggested that the commencement of this action had "effectively stymied Batesville's effort to utilize the Pontones to convert business" in the New York market. ECF No. 548-18 at 3. The court cannot conclude as a matter of law that the interference allegedly perpetrated by Matthews, York Group and

Milso had no adverse impact on the prospective business opportunities available to Batesville, Scott and PCC. The motions for summary judgment filed by Matthews, York Group and Milso will be denied with respect to the tortious interference with prospective economic advantage counterclaims filed by those parties. ECF No. 236 ¶¶ 68-81; ECF No. 333 ¶¶ 203-10.

Harry also asserts counterclaims against Matthews, York Group and Milso for tortious interference with prospective business advantage. ECF No. 333 ¶¶ 211-18. Matthews, York Group and Milso move for summary judgment with respect to those claims. ECF No. 467. Harry's interference claims are grounded in a lost employment opportunity in the aftermath of his retirement.

Mel Payne ("Payne"), the CEO of Carriage Services, Inc. ("Carriage Services"), approached Harry shortly after his retirement and asked him to purchase funeral homes for Carriage Services. ECF No. 535-11 at 52-53. Scott testified that Payne had already decided on a compensation package for Harry, but that Bartolacci was to be contacted in order to ensure that the arrangement would not contravene the non-competition provision in Harry's employment agreement. *Id.* at 56, 64-65. During his deposition, Bartolacci confirmed that he had spoken with Payne about the prospect of Harry working for Carriage Services. ECF No. 535-12 at 6. Bartolacci testified that he had expressed uncertainty about whether the proposed arrangement would constitute a violation of the non-competition provision contained in Harry's employment contract. *Id.* David Adams ("Adams"), the strategic director for Carriage Services, subsequently telephoned Scott and informed him that Harry would not be offered a position with Carriage Services. ECF No. 535-11 at 62. Scott apparently relayed the message to his father. *Id.* Based on the testimonial record, a reasonable jury could infer that Carriage Services' decision not to retain Harry's services was attributable to Bartolacci's statements to Payne.

The terms of Harry's employment contract prohibited him from engaging in a "Competing Business" during the three-year period immediately following the termination of his employment. ECF No. 480-2 at 13. The term "Competing Business" was defined broadly enough to include "any person, corporation or other entity [engaged in the] manufacture[], market[ing] or sell[ing of] caskets, urns, memorials or cremation equipment." *Id.* Scott testified that Carriage Services owned funeral homes and cemeteries throughout the United States. ECF No. 535-11 at 49-50. He explained that Harry's role with the business was to consist of the acquisition of funeral homes. *Id.* at 50. At this stage, the court does not understand Matthews, York Group and Milso to argue that Carriage Services qualified as a "Competing Business" within the meaning of Harry's employment agreement. ECF No. 468 at 11-15. Indeed, Barlolacci described Carriage Services as a Matthews' "customer."[22] ECF No. 535-12 at 7. Since the record contains evidence creating an inference that Matthews, York Group and Milso prevented Harry from securing a permissible employment relationship with Carriage Services, their motion for summary judgment will be denied with respect to Harry's tortious interference with prospective business advantage counterclaims. ECF No. 333 ¶¶ 211-18.

## H.     Batesville's Counterclaims Relating to Kathy Brooks

Brooks started to work as a sales representative for Batesville in January 2004. ECF No. 465 ¶ 15; ECF No. 513 at 21, ¶ 33. The terms of her employment were spelled out in a written employment agreement.[23] ECF No. 548-22 at 2-16. The document stated that Brooks had accepted employment on an "at-will" basis, and that both Batesville and Brooks had "retain[ed] the right to terminate th[e] relationship at any time, with or without cause, for any reason not prohibited by applicable law upon proper notice." *Id.* at 3. The terms of the agreement provided

---

[22] Carriage Services evidently sold caskets supplied by both Matthews and Batesville. ECF No. 535-12 at 6-7.
[23] The agreement contained in the record was evidently executed on October 31, 2006. ECF No. 548-22 at 14. It is not clear whether an earlier version of the contract governed the terms of Brooks' employment before that date.

that, in the event of separation, Brooks was prohibited from marketing competitive products in the same geographic area that she had covered during her final two years as a Batesville employee. *Id.* at 8-10. The prohibition was to remain in effect for two years. *Id.* at 10. Pursuant to the contract, Brooks was forbidden to "make use of [Batesville's] Confidential Information for [her] own purposes or for the benefit of any other entity or person." *Id.* at 7-8. The term "Confidential Information" was broadly defined as

> products and services, marketing strategies, business plans, operations, costs, current or prospective customer information (including customer identities, contacts, requirements, creditworthiness, preferences, and like matters), product concepts, designs, prototypes or specifications, research and development efforts, technical data and know-how, sales information, including pricing and other terms and conditions of sale, financial information, internal procedures, techniques, forecasts, methods, trade information, trade secrets, software programs, project requirements, inventions, trademarks, trade names, and similar information regarding [Batesville's] business(es).

*Id.* at 7.

During the course of her employment with Batesville, Brooks sold caskets and urns to funeral homes in the New York metropolitan area. ECF No. 513 at 22, ¶ 34. Batesville terminated Brooks' employment on January 6, 2010. ECF No. 465 ¶ 16; ECF No. 513 at 22, ¶ 38. After learning about her discharge, Brooks telephoned Andrew and inquired about employment opportunities with Matthews. ECF No. 517-7 at 6-7. On June 7, 2010, Matthews hired Brooks to work as a regional sales manager in its "Bronze" Division. ECF No. 465 ¶ 17. Matthews terminated Brooks' employment in July 2011. *Id.* ¶ 18.

Batesville alleges that Brooks improperly disclosed confidential information and solicited her former Batesville customers during her period of employment with Matthews. ECF No. 236 ¶¶ 97-113. These allegations appear in counterclaims asserted against Matthews, York Group and Milso. *Id.* Those counterclaims appear to rest on a theory of "unfair competition." *Id.* ¶

113. Matthews, York Group and Milso move for summary judgment with respect to the counterclaims. ECF No. 463.

The unfair competition counterclaims asserted by Batesville rest on evidence suggesting that Brooks improperly solicited business from the Massapequa Funeral Home ("Massapequa") shortly after the commencement of her duties with Matthews. Anthony L. Preziosi ("Preziosi"), Massapequa's funeral director, testified that Brooks had successfully convinced Massapequa to regularly purchase products from Batesville during her tenure as a Batesville sales representative. ECF No. 517-6 at 6. At some point in 2008, Massapequa agreed to purchase its products exclusively from Batesville for a period of twenty-four months. ECF No. 466-8 at 4. In December 2010, after the expiration of the contract, Massapequa started to purchase its products from Matthews. *Id.* at 7, 14. Batesville maintains that it lost Massapequa's business because of improper solicitations made by Brooks. ECF No. 512 at 17-19. Matthews, York Group and Milso contend that the change in business was solely attributable to Massapequa's dissatisfaction with Batesville's products and the expiration of the two-year exclusive purchasing agreement. ECF No. 558 at 18-24.

The documentary record confirms that Brooks telephoned Travis Nicholson ("Nicholson"), the owner of Massapequa, on December 1, 2010. ECF No. 548-24 at 3. Preziosi identified the cellular telephone number appearing on Brooks' Verizon Wireless telephone record as that of Nicholson. ECF No. 517-6 at 13. When questioned about Massapequa's decision to start purchasing products from Matthews rather than from Batesville, Preziosi stated that Nicholson and he had jointly made the decision in December 2010. *Id.* at 12-13. During his deposition, Andrew testified that Massapequa personnel had become dissatisfied with Batesville's "level of service" in the aftermath of Brooks' departure. ECF No. 548-21 at 15. He

stated that since Massapequa's "relationship with Batesville" had essentially existed "through Kathy," the individuals responsible for purchasing products on behalf of Massapequa had become alienated with Batesville because of Brooks' discharge. *Id.* Based on the evidence relied upon by Batesville, a reasonable trier of fact could conclude that Massapequa's decision to switch its dealings from Batesville to Matthews was triggered by contractually-prohibited solicitations made by Brooks.

As of December 2010, Brooks was contractually prohibited from soliciting Massapequa's business on Matthews' behalf and disclosing Batesville's "Confidential Information." ECF No. 548-22 at 7-10. Under the terms of her employment agreement with Batesville, Brooks was forbidden to disclose "customer identities, contacts, requirements, creditworthiness, preferences, and like matters." *Id.* at 7. The tort of unfair competition encompasses a wide range of "commercial immorality." *Telecom*, 280 F.3d at 197. Even the misappropriation of a business strategy can support an unfair competition claim. *Berman*, 580 F.Supp.2d at 209. Because a reasonable jury could conclude that Matthews improperly utilized Brooks' "relationship" with Massapequa to take its business from Batesville, the motion for summary judgment pertaining to Batesville's "unfair completion" counterclaims will be denied. ECF No. 236 ¶¶ 97-113.

I.     **The Breach-of-Contract Counterclaims**

The employment agreements applicable to Scott and Harry required York Group "to cause its directors, officers, agents, representatives, stockholders, employees and affiliates not to[] disparage [Scott or Harry], either orally or in writing." ECF No. 470-1 at 15; ECF No. 480-2 at 14. Scott and Harry assert counterclaims against Matthews, York Group and Milso for alleged breaches of this contractual obligation. ECF No. 333 ¶¶ 165-85. Matthews, York Group and Milso move for summary judgment with respect to those counterclaims. ECF No. 467. The

court has already concluded that, based on the evidence contained in the record, a reasonable jury could infer that Matthews employees disparaged Scott in the presence of prospective customers, and that Scott suffered pecuniary losses as a result of such disparagement. ECF No. 466-5 at 2; ECF No. 548-17 at 2-3. Therefore, the motion for summary judgment will be denied with respect to Scott's breach-of-contract counterclaims. ECF No. 333 ¶¶ 165-74.

On May 30, 2007, Harry's employment agreement with York Group was amended. ECF No. 527-5. The amendments changed the terms of Harry's compensation. *Id.* at 2. Section 1.03(c) of the amended agreement provided as follows:

> Notwithstanding that Employee is not entitled to any future bonus, the Company's board of directors may, in the future, in its sole discretion and only after a majority vote decide to award a bonus to Employee based upon merit and the future performance of the Company.

*Id.* at 2-3. It is undisputed that Harry was not awarded the bonus referenced in Section 1.03(c). Harry alleges that Matthews, York Group and Milso breached the amended agreement by declining to award him a "merit bonus" despite the fact that he had been one of their "top producers." ECF No. 333 ¶ 181.

In an attempt to establish that the denial of his bonus constituted a breach of the employment agreement, Harry relies on language in *Dalton v. Educational Testing Service*, 663 N.E.2d 289, 291 (N.Y. 1995), declaring that a contract which "contemplates the exercise of discretion" incorporates an implicit "promise not to act arbitrarily or irrationally in exercising that discretion." ECF No. 522 at 13-14. That language in *Dalton*, however, was used with reference to New York's implied "covenant of good faith and fair dealing in the course of contract performance." *Dalton*, 663 N.E.2d at 291. The New York Court of Appeals went on to state that "[t]he duty of good faith and fair dealing" was "not without limits," and that "no obligation c[ould] be implied that 'would be inconsistent with other terms of the contractual

52

relationship.'" *Id.* at 291-92 (quoting *Murphy v. American Home Products Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983)). The amended contract plainly provided that Harry was "*not* entitled to any future bonus," and that the provision of such a bonus rested within the "*sole* discretion" of York Group's board of directors. ECF No. 527-5 at 2 (emphasis added). The contract's use of the word "sole" indicates that certain prerogatives were "reposed in the [board of directors] and nowhere else." *Nixon v. United States*, 506 U.S. 224, 229 (1993)(interpreting the provision in Article I, § 3, of the United States Constitution affording the United States Senate "the sole Power to try all Impeachments"). "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990). Since the contractual language in question unambiguously stated that Harry was "*not* entitled to any future bonus," his breach-of-contract counterclaim relating to the desired bonus must be dismissed. *Namad v. Salomon, Inc.*, 543 N.E.2d 722, 723 (N.Y. 1989)("To read the second sentence of the bonus clause as binding defendants to pay plaintiff a fixed amount approximating his annual salary—as he alleges was the 'customary policy'—would render the previous sentence vesting defendants with complete discretion a nullity.").

Harry alleges that Matthews, York Group and Milso breached the amended agreement by excluding him from meetings of the board of directors. ECF No. 333 ¶ 182. Testimony provided by Bartolacci suggests that Harry *may* not have been present for some meetings conducted in Pittsburgh.[24] ECF No. 527-2 at 98-100. Even if that is the case, it does not follow that the agreement was breached. Section 1.01 of the agreement stated that Harry was expected

---

[24] The responsive brief filed by Scott, Harry and PCC mischaracterizes Bartolacci's testimony by stating that "Bartolacci testified under oath that Milso's Board regularly met informally in Pittsburgh without sending any notice to Harry, and without keeping any minutes to be distributed to Harry." ECF No. 522 at 14. Bartolacci actually testified that, to the best of his recollection, Harry had been present for several of the meetings. ECF No. 527-2 at 98-100.

to "perform such duties for the Company as may reasonably be assigned to him from time to time by the Company's board of directors." ECF No. 527-5 at 2. The relevant portion of the agreement went on to provide as follows:

> Employee acknowledges that a reasonable assignment of duties includes expecting his regular attendance at meetings of the Board of Directors of the Company and of Milso, and expecting his regular attendance at meetings of the Executive Committee of either entity should he choose to remain a member of such committees, *provided*, however, that Employee shall be permitted to resign his membership on either Committee or decline to accept any future assignment of duties by the Company's or Milso's board of directors should he wish to do so in his sole discretion.

*Id.* Although this language suggests that Harry was contractually *expected* (or *obligated*) to attend certain meetings in connection with a "reasonable assignment of duties," it does not support his assertion that he had a contractually-enforceable *right* to prevent meetings from being conducted outside of his presence. "Where a written agreement between sophisticated, counseled businessmen is unambiguous on its face, one party cannot defeat summary judgment by a conclusory assertion that, owing to mutual mistake or fraud, the writing did not express his own understanding of the oral agreement reached during negotiations." *Chimart Assocs. v. Paul*, 489 N.E.2d 231, 232 (N.Y. 1986). Matthews, York Group and Milso are entitled to summary judgment with respect to Harry's breach-of-contract counterclaims based on his alleged exclusion from board meetings. ECF No. 333 ¶ 182.

To some extent, Harry appears to base his breach-of-contract counterclaims on alleged violations of the non-disparagement provision of the employment contract. ECF No. 333 ¶ 180. There are, however, several problems with Harry's attempt to rely on such a theory. Ferris' email of July 15, 2010, which underpins Scott's breach-of-contract counterclaims, suggests that Matthews sales representatives were specifically instructed *not* to "bash Harry."[25] ECF No. 466-

---

[25] The text of this email is specifically contained in Scott's pleadings. ECF No. 333 at 36-37, ¶ 171.

5 at 2.  Furthermore, a plaintiff asserting a breach-of-contract claim must demonstrate that he or she has actually been damaged by the alleged breach.  *Action Nissan, Inc. v. Nissan North America*, 454 F.Supp.2d 108, 133 (S.D.N.Y. 2006).  The testimonial record suggests that some customers were unwilling to deal with Scott and PCC because of disparaging comments uttered by Matthews personnel.  ECF No. 517-16 at 7.  Harry does not point to evidence indicating that he was damaged by any statements alleged to have constituted "disparagement."  ECF No. 522 at 13.  Although Bartolacci's conversation with Payne creates an inference that Matthews, York Group and Milso tortiously interfered with Harry's prospective employment with Carriage Services by falsely suggesting that the proposed arrangement would violate a contractual provision, the record does not support a finding that Harry was "disparaged" while the terms of his contract were being discussed.  ECF No. 535-12 at 6-7.  For these reasons, the motion for summary judgment filed by Matthews, York Group and Milso will be granted with respect to Harry's breach-of-contract counterclaims.  ECF No. 333 ¶¶ 175-85.

> **J.     The Counterclaims Based on the Implied Covenant of Good Faith and Fair Dealing**

The law of New York implies a covenant of good faith and fair dealing "pursuant to which neither party to a contract [may] do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)(*per curiam*).  Scott and Harry allege that Matthews, York Group and Milso breached this implied covenant by bringing "baseless claims" grounded in the employment agreements.  ECF No. 333 ¶¶ 191, 199.  Matthews, York Group and Milso move for summary judgment with respect to the counterclaims premised on alleged violations of the implied covenant.  ECF No. 467.

As an initial matter, New York does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing when the factual allegations underpinning the claim mirror those constituting breaches of contractual obligations. *Dell's Maraschino Cherries Co., Inc. v. Shoreline Fruit Growers, Inc.*, 887 F.Supp.2d 459, 482 (E.D.N.Y. 2012). To the extent that the counterclaims premised on the implied covenant are based upon conduct alleged to be in violation of contractual provisions, they must be dismissed. *Fellows v. CitiMortgage, Inc.*, 710 F.Supp.2d 385, 407 (S.D.N.Y. 2010). "[A] covenant of good faith can be implied only where the implied term is consistent with other mutually agreed upon terms in the contract." *Sabetay v. Sterling Drug, Inc.*, 506 N.E.2d 919, 922 (N.Y. 1987). Section 5.03 of the employment agreements provided as follows:

> 5.03. <u>Remedies</u>. In the event of a breach by Employee of the terms of this Agreement, the Company shall be entitled, if it shall so elect, to institute legal proceedings to obtain damages for any such breach, or to enforce the specific performance of this Agreement by Employee and to enjoin Employee from any further violation of this Agreement and to exercise such remedies cumulatively or in conjunction with all other rights and remedies provided by law. Employee acknowledges, however, that the remedies at law for any breach by him of the provisions of this Agreement may be inadequate and that the Company shall be entitled to injunctive relief against him in the event of any breach.

ECF No. 470-1 at 15; ECF No. 480-2 at 14. This language specifically *preserves* York Group's right to commence the instant action. "[C]ourts have declined to find that the implied covenant of good faith and fair dealing adds to the contract a substantive provision not intended by the parties." *Geren v. Quantum Chemical Corp.*, 832 F.Supp. 728, 732 (S.D.N.Y. 1993). It is worth noting that Scott and Harry have themselves commenced civil actions in order to enforce their rights under the relevant contracts. ECF No. 191-2 at 2-9. They cannot credibly assert that Matthews, York Group and Milso acted in violation of covenants implicit in those contracts merely by commencing the instant action to enforce the terms thereof. Therefore, the court will

dismiss the counterclaims grounded on alleged breaches of the implied covenant of good faith and fair dealing.  ECF No. 333 ¶¶ 186-202.

### K.    The Intrusion on Seclusion Counterclaims

Scott and Harry assert counterclaims against Matthews, York Group and Milso for intruding on their seclusion.  ECF No. 333 ¶¶ 279-92.  These claims are based on allegations that Scott and Harry were subjected to the "unauthorized surveillance and investigation of [their] whereabouts, travels, personal associates, family members, daily activities, and other private personal and financial affairs." *Id.* ¶¶ 280, 287.  Matthews, York Group and Milso move for summary judgment on two separate grounds.  First, they contend that the counterclaims should be dismissed because New York does not recognize a cause of action for "intrusion on seclusion."  ECF No. 468 at 28; ECF No. 562 at 22.  Second, they maintain that Scott and Harry cannot establish actionable violations of Pennsylvania's tort law in any event.  ECF No. 468 at 28-29; ECF No. 562 at 22-23.  Since Pennsylvania's choice-of-law rules compel the application of New York law to the counterclaims, the court has no occasion to consider whether the alleged actions of Matthews, York Group and Milso were otherwise violative of Pennsylvania law.

Pennsylvania law imposes liability on "[o]ne who intentionally intrudes, physically or otherwise, upon the solicitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." *Harris v. Easton Publishing Co.*, 483 A.2d 1377, 1383 (Pa.Super.Ct. 1984) (quoting the Restatement (Second) of Torts § 652B). Unlike Pennsylvania, New York has "no common law of privacy." *Howell v. New York Post Co.*, 612 N.E.2d 699, 703 (N.Y. 1993).  In New York, "the right to privacy is governed exclusively" by statutory provisions "prohibit[ing] the use of a living person's name, portrait or picture for 'advertising' or 'trade' purposes without [his or her] prior written consent." *Id.*  The

counterclaims for intrusion on seclusion are not based on conduct proscribed by those statutes. ECF No. 333 ¶¶ 279-92. Hence, Scott and Harry are attempting to proceed with claims that are cognizable in Pennsylvania but not in New York.

In order "for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that [the] choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981)(plurality opinion). Scott and Harry argue that Matthews, York Group and Milso are "subject to Pennsylvania law" because "their business is directed and controlled from Pittsburgh." ECF No. 522 at 19. Because the Full Faith and Credit Clause and the Due Process Clause place only "modest restrictions" on a state's ability to apply its own law to a particular dispute, Pennsylvania's contacts with the parties and events at issue in this case would render the application of its substantive law constitutionally *permissible*. *Phillips Petroleum Co.*, 472 U.S. at 818. The mere fact that Pennsylvania *could* apply its own law in this case, however, does not mean that it *would* do so. *Cipolla v. Shaposka*, 267 A.2d 854, 856-57 (Pa. 1970)(applying the law of Delaware over that of Pennsylvania even though each jurisdiction had an interest in having its own law govern the case). Since this case falls within the overlapping legislative jurisdiction of Pennsylvania and New York, the law of either state could be constitutionally applied. *Sun Oil Co. v. Wortman*, 486 U.S. 717, 727 (1988)(explaining that "it is frequently the case under the Full Faith and Credit Clause that a court can lawfully apply either the law of one State or the contrary law of another").

In any case involving a choice-of-law question, Pennsylvania applies a "flexible rule" permitting a specific "analysis of the policies and interests underlying the particular issue before the court." *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805 (Pa. 1964). The first step in the

analysis is to ascertain whether the conflict between the competing laws constitutes a "true" conflict, a "false" conflict, or an "unprovided-for" case. *Howden North America, Inc. v. ACE Property & Cas. Ins. Co.*, 875 F.Supp.2d 478, 495 (W.D.Pa. 2012). A "true" conflict exists when each jurisdiction has an interest in applying its substantive law. *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 n.15 (3d Cir. 1991). In that situation, the court must "determin[e] which state has the greater interest in the application of its law." *Cipolla*, 267 A.2d at 566. "A false conflict exists if only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law." *Lacey*, 932 F.2d at 187. In the event of a false conflict, the court must apply the law of the interested jurisdiction. *Kuchinic v. McCrory*, 222 A.2d 897, 899-900 (Pa. 1966). An "unprovided-for" case exists when neither jurisdiction's interests would be impaired by the application of the other jurisdiction's law. *Budget Rent-A-Car System, Inc. v. Chappell*, 407 F.3d 166, 170 (3d Cir. 2005). The traditional *lex loci delicti* rule, which applies "the law of the place of the wrong," "continues to govern unprovided-for cases." *Id.*

Scott and Harry are domiciled in New York. ECF No. 70 ¶¶ 9-10. The surveillance alleged to have been tortious occurred primarily in New York. ECF No. 333 ¶¶ 279-92. Matthews, York Group and Milso operate out of Pennsylvania. ECF No. ¶¶ 6-8. Since the parties are essentially advancing countervailing arguments disfavoring the application of the laws of their respective domiciles, neither jurisdiction has a particularly strong interest in applying its law to the counterclaims. *Miller v. Gay*, 470 A.2d 1353, 1355 (Pa.Super.Ct. 1983). Pennsylvania has no interest in imposing liability on its own businesses for engaging in extraterritorial conduct that was not tortious where performed. New York has no interest in providing Scott and Harry with remedies for conduct that it does not regard as tortious. This is

arguably an "unprovided-for" case in which the *lex loci delicti* rule should govern, thereby defaulting to New York law. *Garcia v. Plaza Oldsmobile Ltd.*, 421 F.3d 216, 220 (3d Cir. 2005).

Even if it is assumed that a deeper choice-of-law analysis is needed, the law of New York would govern the counterclaims based on alleged violations of privacy rights. Pennsylvania's choice-of-law rules are grounded in the Restatement (Second) of Conflict of Laws. *Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co.*, 609 F.3d 223, 233 (3d Cir. 2010). Section 152 of the Restatement provides that "[i]n an action for an invasion of a right of privacy, the local law of the state where the invasion occurred determines the rights and liabilities of the parties . . . ." Restatement (Second) of Conflict of Laws § 152. Scott and Harry, who reside in New York, have the right to sue for intrusion on seclusion under the law of the state where the invasion occurred, which also happens to be their state of domicile. *Howell*, 612 N.E.2d at 703. Under these circumstances, Pennsylvania's choice-of-law rules would not permit Scott and Harry to invoke Pennsylvania's substantive law to redress conduct occurring in New York. *Shuder v. McDonald's Corp.*, 859 F.2d 266, 270 (3d Cir. 1988)(observing that, under Pennsylvania law, residents of another state "should not be accorded rights not given them by their home state" to redress conduct occurring therein); *Miller*, 470 A.2d at 1356 (remarking that inhabitants of another state "should not be accorded rights not given them" by that state merely "because a visitor from a state offering higher protection decides to visit there"). The motion for summary judgment filed by Matthews, York Group and Milso will be granted with respect to the "intrusion on seclusion" counterclaims. ECF No. 333 ¶¶ 279-92.

### L. The False and Misleading Advertising Counterclaims

Scott and PCC assert counterclaims against Matthews, York Group and Milso for "false, deceptive, and misleading advertising." ECF No. 333 ¶¶ 294-95. The counterclaims themselves

do not make reference to specific statutory provisions. *Id.* When Matthews, York Group and Milso moved for summary judgment, they pointed out that the legal basis for the counterclaims was unclear. ECF No. 468 at 30 n.18. In a responsive brief, Scott and PCC contend that they can establish actionable violations of both the Lanham Act and New York General Business Law §§ 349(h) and 350.

Federal Rule of Civil Procedure 8(a)(2) requires a complaint asserting a claim to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The factual allegations contained in the complaint must be sufficient to "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although "legal conclusions" are not entitled to a "presumption of truth," they are often necessary to "provide the framework of a complaint." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The averments pertaining to the false advertising claims are so imprecise that they have left Matthews, York Group and Milso unsure about whether the claims are grounded in federal or state law. ECF No. 333 ¶¶ 293-99; ECF No. 468 at 30 n.18. "A plaintiff may not amend [his or] her complaint through argument in a brief opposing summary judgment." *Nykiel v. Borough of Sharpsburg*, 778 F.Supp.2d 573, 587 (W.D.Pa. 2011). For this reason, the false advertising counterclaims should arguably be dismissed on the ground that they were never properly pled in the first place. *Id.* In any event, however, Scott and PCC cannot establish violations of the Lanham Act and New York General Business Law §§ 349(h) and 350 even if it is assumed that they properly stated claims under those statutory provisions.

A federal court operating under the strictures of Article III "generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit." *Sinochem Int'l Co., Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007).

Like all other Article III tribunals established by Congress, this court exercises "[t]he judicial Power of the United States." U.S. CONST., ART. III, § 1. This "judicial Power" is validly exercised only where a live "Case" or "Controversy" exists between the parties. *Id.* An action does not constitute a justiciable "Case" or "Controversy" unless the person bringing the action has the proper legal "standing" to do so. *Flast v. Cohen*, 392 U.S. 83, 95 (1968). In order for a plaintiff to have Article III standing, he or she must establish that: (1) he or she has suffered an "injury in fact" (*i.e.*, an invasion of a legally protected interest that is both (a) concrete and particularized and (b) actual or imminent, and not merely conjectural or hypothetical); (2) there is a causal relationship between his or her injury and the alleged conduct of the defendant; and (3) it is likely that the injury will be redressed by a decision rendered in his or her favor. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "This triad of injury in fact, causation, and redressability comprises the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998). Article III's injury-in-fact requirement can be satisfied by "an identifiable trifle of injury." *NCAA v. Governor of N.J.*, 730 F.3d 208, 219 (3d Cir. 2013). "Apart from this minimal constitutional mandate," the Supreme Court "has recognized other limits on the class of persons who may invoke [a federal court's] decisional and remedial powers." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). The "judicially-imposed limits on the exercise of federal jurisdiction" include "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright*, 468 U.S. 737, 751 (1984).

Unlike the jurisdictional limitations inherent in Article III, which exist as a matter of constitutional mandate, the prudential limitations on the exercise of federal adjudicatory jurisdiction "can be modified or abrogated by Congress." *Bennett v. Spear*, 520 U.S. 154, 162 (1997). Section 43(a)(1) of the Lanham Act provides:

> **§ 1125. False designations of origin, false descriptions, and dilution forbidden**
>
> **(a) Civil Action.**
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). In enacting the Lanham Act, Congress aimed "to protect persons engaged in [interstate] commerce against unfair competition." 15 U.S.C. § 1127. "The congressionally-stated purpose of the Lanham Act, far from indicating an express intent to abrogate prudential standing doctrine, evidences an intent to limit standing to a narrow class of potential plaintiffs possessing interests the protection of which furthers the purposes of the Lanham Act." *Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 229 (3d Cir. 1998).

The Lanham Act does not give standing to parties "having no competitive or commercial interests affected by the conduct at issue." *Id.* The issue of standing, however, must still be considered in relation to the statutory provision giving rise to the claim. *Warth*, 422 U.S. at 500

(explaining that a plaintiff's standing to bring a particular claim "often turns on the nature and source of the claim asserted"). Given that the plain language of the statute provides a remedy to "any person who believes that he or she is likely to be damaged," prudential standing under the Lanham Act "demands only proof providing a reasonable basis for the belief that the plaintiff is likely to be damaged as a result of the false advertising." *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir. 1980). This standard screens out frivolous claims and prevents the federal courts from being flooded with "Lanham Act claims contrary to the type envisioned by Congress." *Thorn v. Reliance Van Co., Inc.*, 736 F.2d 929, 933 (3d Cir. 1984). Since Scott and PCC market products on behalf of Matthews' main competitor in the New York market, their alleged "injuries" are sufficiently connected to Matthews' "false advertising" to establish their standing to seek relief under the Lanham Act. *Joint Stock Society v. UDV N. Am., Inc.*, 266 F.3d 164, 179-85 (3d Cir. 2001).

In order to proceed with their claims under the Lanham Act, Scott and PCC must demonstrate that Matthews, York Group or Milso made false statements "in connection with any goods or services," or that they conveyed misrepresentations "in commercial advertising or promotion." 15 U.S.C. § 1125(a)(1). This inquiry centers on whether "the contested representations are part of an organized campaign to penetrate the relevant market." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002). The claims asserted by Scott and PCC are premised, to a large extent, on language appearing in a press release announcing Harry's retirement and discussing the Pontone family's contributions to the funeral service industry. ECF No. 523 ¶¶ 184-85; ECF No. 533-17 at 1. Scott and PCC accuse Matthews of falsely claiming that customers continued to be serviced at the same location at which Harry had started the business eighty years earlier, even though that facility was no longer

being utilized. ECF No. 522 at 33. Given the context and purpose of the press release, however, no reasonable jury could conclude that the statements contained therein were made "in commercial competition with" other businesses or "with the intention of influencing customers" to purchase "goods or services." *Nevyas v. Morgan*, 309 F.Supp.2d 673, 680-81 (E.D.Pa. 2004).

The remaining Lanham Act counterclaims are based on allegations that Matthews, York Group and Milso failed to disclose that certain products had been manufactured by Batesville and gave pretextual reasons for certain price increases. ECF No. 523 ¶¶ 186-88. Where a plaintiff proves the literal falsity of advertisements or promotions, "a court may grant relief without considering whether the buying public was actually misled." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 586 (3d Cir. 2002). Absent a showing of literal falsity, "the success of the claim usually turns on the persuasiveness of a consumer survey" offered to *prove* that the challenged communication is "deceptive or misleading." *Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Rhone-Poulenc Rorer Pharmaceuticals, Inc.*, 19 F.3d 125, 129-30 (3d Cir. 1994). The evidence provided by Scott and PCC consists primarily of internal emails suggesting that prices may have been adjusted in response to information found on Batesville's pricelist. ECF No. 523 ¶ 188; ECF Nos. 549-59 & 549-60. While those emails are offered for the purpose of establishing the falsity of certain communications, the contents of the communications are not *themselves* offered as evidence.[26] In the absence of specific advertisements or promotions, Scott and PCC cannot show that any particular statement was literally false. *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922 (3d Cir. 1990)(explaining that whether a communication is "false or misleading" must be ascertained by reference to "the message conveyed"). Since they

---

[26] Given the voluminous nature of the record and the excessive number of counterclaims asserted in this case, the court will not scour the documentary evidence in search of information that is not cited by the parties. FED. R. CIV. P. 56(c)(3).

cannot show the literal falsity of a specific communication, Scott and PCC are not "excused from the burden of demonstrating actual deception through the use of a consumer survey." *Novartis Consumer Health*, 290 F.3d at 587. No such evidence was offered. Accordingly, Matthews, York Group and Milso are entitled to summary judgment with respect to any counterclaims brought under the Lanham Act. ECF No. 333 ¶¶ 293-99.

"False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]" is statutorily prohibited. N.Y. CLS GEN. BUS. § 350. An individual aggrieved by a violation of this statute "may bring an action in his [or her] own name to enjoin [the] unlawful act or practice, an action to recover his [or her] actual damages or fifty dollars, whichever is greater, or both actions." N.Y. CLS GEN. BUS. § 349(h). Upon a finding that a defendant has "willfully or knowingly" violated the statute, a court may "increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars." *Id.* Scott and PCC seek both injunctive relief and money damages in this case. ECF No. 333 ¶¶ 298-99.

A plaintiff asserting a "false advertising" claim under New York law must demonstrate that the defendant "is engaging in an act or practice that is deceptive or misleading in a material way." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995). A plaintiff must show "consumer-oriented conduct that would mislead a reasonable consumer." *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F.Supp.2d 217, 251 (S.D.N.Y. 2004). Since Scott and PCC do not provide evidence of specific communications directed at consumers, they cannot establish that any particular communication would deceive or mislead an objectively reasonable person. The motion for summary judgment filed by

Matthews, York Group and Milso will be granted with respect to all counterclaims premised on a theory of "false advertising."  ECF No. 333 ¶¶ 293-99.

M.      Harry's Misappropriation Counterclaims

Section 50 of New York's Civil Rights Law provides that "[a] person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor."  N.Y. CLS Civ. R. § 50.  "Any person whose name, portrait, picture or voice is used" in violation of that prohibition "may maintain an equitable action . . . against the person, firm or corporation so using his [or her] name, portrait, picture or voice, to prevent and restrain the use thereof," and "may also sue and recover damages for any injuries sustained by reason of such use . . . ."  N.Y. CLS Civ. R. § 51.  New Jersey recognizes a common-law tort for the misappropriation of an individual's "name and image" in connection with "a commercial purpose directly benefiting" the defendant.  *G.D. v. Kenny*, 15 A.3d 300, 321 (N.J. 2011).  Harry alleges that Matthews, York Group and Milso wrongfully used his name, portrait and image to promote their products to potential customers without seeking his permission to do so.  ECF No. 333 ¶¶ 244-57.

In a letter dated May 18, 2009, Bartolacci offered to extend Harry's employment through September 2014.  ECF No. 532-6.  In connection with the offer, Matthews sought permission to utilize Harry's name in certain "trade publications" and "customer letters" for the purpose of supporting its Casket Division.  *Id.* at 2.  Harry ultimately rejected the offer and decided to retire.  ECF No. 587 at 39-41, ¶ 72, 90-91, ¶ 1.

The record indicates that photographs of Harry and his brothers were displayed at customer appreciation events held in New York and New Jersey.  ECF No. 530-5 at 11-15.

Harry asserts counterclaims against Matthews, York Group and Milso for misappropriating his name, image and likeness to further their commercial interests. ECF No. 333 ¶¶ 244-57. Matthews, York Group and Milso argue that Harry's counterclaims are barred by the applicable statutes of limitations. ECF No. 562 at 19. The problem with that argument is that the statutes of limitations, which operate as affirmative defenses, were never raised in the answer to the counterclaims. ECF No. 388 at 35-37. Because the misappropriation claims appear to be based, at least in part, on communications with customers after the relevant customer appreciation events, it is not clear whether the application of the statutes of limitations would be prejudicial to Harry. *Kleinknecht v. Gettysburg Coll.*, 989 F.2d 1360, 1373-74 (3d Cir. 1993). It is certainly conceivable that he may have engaged in further discovery of this issue had he known that statute-of-limitations defenses would be forthcoming. ECF No. 522 at 31.

The statutory provision applicable in New York does not "prevent any person, firm or corporation from using the name, portrait, picture or voice of any manufacturer or dealer in connection with the goods, wares and merchandise manufactured, produced or dealt in by him which he has sold or disposed of with such name, portrait, picture or voice used in connection therewith." N.Y. CLS CIV. R. § 51. Matthews, York Group and Milso assert that Harry's misappropriation claims are barred by this statutory language. ECF No. 468 at 23-24. Their argument is based on language in the asset purchase agreement stating that Harry (along with the other sellers) was transferring "[a]ll right, title and interest . . . in and to the goodwill incident to the Business." ECF No. 4-1 at 19. The language of the asset purchase agreement, however, does not speak with clarity in relation to the use of Harry's name and image for advertising purposes. Under New York law, a person's "written consent" is required to render the use of his or her name or image "for advertising purposes" lawful. N.Y. CLS CIV. R. § 51. The statutory

prerequisite clearly contemplates something more definitive than the vague phraseology found in the asset purchase agreement.

New York's statutory prohibition is violated only where the unauthorized use of a person's name is used for the purpose of "advertising" or "trade." *Herink v. Harper & Row Publishers, Inc.*, 607 F.Supp. 657, 659 (S.D.N.Y. 1985). A plaintiff asserting a misappropriation claim under New York law must show that his or her name or image was wrongfully utilized "for a commercial purpose." *G.D.*, 15 A.3d at 321. Matthews, York Group and Milso contend that Harry's name and likeness were used only "to celebrate the Pontone family's 80th anniversary of service in the casket industry." ECF No. 468 at 24. Nevertheless, New York law does not permit a "commercial advertiser" to "unilaterally neutralize or override the long-standing and significant statutory privacy protection by wrapping its advertising message in the cloak of public interest, however commendable the educational and informational value." *Beverly v. Choices Women's Med. Ctr., Inc.*, 587 N.E.2d 275, 279 (N.Y. 1991). The images of Harry were evidently displayed at events to which several Matthews customers were invited. ECF No. 530-5 at 14. Under these circumstances, the question whether Harry's name and image were used for "advertising" or "trade" purposes presents a question of fact for the jury. *Freihofer v. Hearst Corp.*, 477 N.Y.S.2d 847, 850 (N.Y. App. Div. 1984).

Matthews, York Group and Milso argue that "Harry has demonstrated no damage as a result of the alleged misappropriation of his likeness." ECF No. 468 at 25. The plain language of the statute, however, contains no requirement of injury for the maintenance of an "equitable action" to "prevent and restrain" the unauthorized use of one's "name, portrait, picture or voice . . . for advertising purposes or for the purposes of trade . . . ." N.Y. CLS CIV. R. § 51. Harry seeks both injunctive and monetary relief. ECF No. 333 ¶¶ 254-55, 257. He may be entitled to

equitable relief even if no damages resulted from the alleged misappropriation of his name, image and likeness. *Schwartz v. Hebrew Nat'l, Inc.*, 497 N.Y.S.2d 1000, 1002-03 (N.Y. Spec. Term 1986). The motion for summary judgment filed by Matthews, York Group and Milso will be denied with respect to Harry's misappropriation counterclaims. ECF No. 333 ¶¶ 244-57.

## N.     Scott's Defamation Counterclaims

Scott asserts counterclaims against Matthews, York Group and Milso for defamation.[27] ECF No. 333 ¶¶ 258-66. Under New York law, a writing constitutes defamation "if it tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community, even though it may impute no moral turpitude to him." *Mencher v. Chesley*, 75 N.E.2d 257, 259 (N.Y. 1947). A writing's susceptibility to defamatory meaning presents a question of law for the court to decide. *Tracy v. Newsday, Inc.*, 155 N.E.2d 853, 854-55 (N.Y. 1959). "[I]f the words taken in their natural and ordinary meaning are susceptible to a defamatory connotation, then it is for the jury to decide how [they] would be understood by the average reader." *Carney v. Mem'l Hosp. & Nursing Home of Green Cnty.*, 475 N.E.2d 451, 453 (N.Y. 1985). In order to establish an actionable defamation claim, Scott must demonstrate that: (1) Matthews' officials made a defamatory statement of fact; (2) the statement was false; (3) the statement was published to a third party; (4) the statement was "of and concerning" Scott; (5) the officials spoke with the applicable level of fault; (6) the speech either constituted defamation *per se* or caused special harm; and (7) the speech was not privileged. *Albert v. Loksen*, 239 F.3d 256, 265-66 (2d Cir. 2001).

---

[27] Matthews, York Group and Milso argue that these claims are barred by New York's one-year statute of limitations. ECF No. 468 at 26; N.Y. CLS CIV. PRAC. § 215(3). Since the defamation claims lack viability for other reasons, the court does not need to consider whether Matthews, York Group and Milso have waived the statute-of-limitations defense by failing to include it in their answer. *Lassiter v. City of Phila.*, 716 F.3d 53, 56 n.2 (3d Cir. 2013).

Scott's defamation claims are partially based on an email sent by the Casket & Funeral Supply Association of America ("CFSA") on September 21, 2010. ECF No. 333 ¶ 262. The relevant portion of the CFSA's message stated as follows:

**Matthews Sues Scott Pontone & Batesville**

The York Group, Milso Industries and Matthews International Corporation have filed a complaint against Scott Pontone and Batesville Casket co. [sic], Inc., for "wrongful solicitation of Plaintiff's employees and customers." Matthews alleges that Batesville hired Mr. Pontone to facilitate the hiring of two key Matthews employees and solicit customer accounts with the knowledge that Mr. Pontone had a non-compete clause in his employment agreement until May 30, 2011. Matthews has requested a jury trial in the Western District of Pennsylvania District Court.

ECF No. 470-29 at 2 (boldface type in original). The statement referring to a "non-compete clause" was obviously alluding to the provision of Scott's amended employment agreement prohibiting him from soliciting *employees* of York Group and Milso for a period of four years. ECF No. 28-3 at 4. The non-competition provision of his contract had already expired when the instant action was commenced. *Id.* Scott alleges that this misstatement caused him to suffer "harm and loss" in his "trade, business, or profession." ECF No. 333 ¶ 263.

The statement relied upon by Scott in support of his defamation claims is incapable of defamatory meaning as a matter of law. *Tracy*, 155 N.E.2d at 854. Words that are "not reasonably susceptible of a defamatory meaning . . . are not actionable and cannot be made so by a strained or artificial construction." *Aronson v. Wiersma*, 483 N.E.2d 1138, 1139 (N.Y. 1985). "The words must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader." *Id.* Even if it is assumed that the message sent by the CFSA can be credibly attributed to information provided by Matthews, York Group or Milso, the statement contained therein constituted nothing more than an inartful (or legally incorrect) characterization of the contractual provision prohibiting Scott from soliciting

Pesce and Redmond. No reasonable reader would view the CFSA's use of the term "non-compete clause" (rather than the phrase "non-solicitation clause") as a defamatory misstatement.

Scott also bases his defamation claims on the contents of the email sent by Ferris on July 15, 2010. ECF No. 333 ¶¶ 260-61. That email contained a statement asserting that Scott had "torn his family apart." ECF No. 466-5 at 2. In the portion of his brief opposing the motion for summary judgment in relation to his breach-of-contract counterclaims, Scott correctly points out that Matthews, York Group and Milso were contractually prohibited from uttering disparaging statements about him regardless of the truth or falsity of such statements. ECF No. 522 at 12. The inquiry differs when defamation is at issue, since a plaintiff attempting to establish liability under such a theory must demonstrate that the defendant made a *false* statement of *fact*. *Albert*, 239 F.3d at 265-66. The New York Court of Appeals recently declared that "only statements of fact can be defamatory because statements of pure opinion cannot be proven untrue." *Thomas H. v. Paul B.*, 965 N.E.2d 939, 942 (N.Y. 2012). Ferris' statement (which was allegedly reiterated by others in the presence of customers) cannot be reasonably characterized as a false factual assertion. *Albert*, 239 F.3d at 265-66. Since the statement is not "capable of being proven true or false," it cannot constitute actionable defamation under the law of New York. *Brian v. Richardson*, 660 N.E.2d 1126, 1129 (N.Y. 1995). The motion for summary judgment filed by Matthews, York Group and Milso will be granted with respect to Scott's defamation counterclaims. ECF No. 333 ¶¶ 258-66.

### O.    The Unjust Enrichment Counterclaims

Batesville, Scott, Harry and PCC all assert counterclaims against Matthews, York Group and Milso for unjust enrichment. ECF No. 236 ¶¶ 92-96; ECF No. 333 ¶¶ 219-32. As explained earlier, "the doctrine of unjust enrichment is inapplicable when the relationship between parties

is founded upon a written agreement or express contract." *Wilson Area Sch. Dist.*, 895 A.2d at 1254. The unjust enrichment counterclaims asserted by Scott and Harry are pled as alternatives to their respective breach-of-contract counterclaims. ECF No. 333 ¶¶ 225, 232. Because their business relationships with Matthews, York Group and Milso were governed by the terms of express contracts, they cannot proceed on a theory of unjust enrichment. *Third Nat'l Bank & Trust Co. of Scranton v. Lehigh Valley Coal Co.*, 44 A.2d 571, 574 (Pa. 1945)(explaining that the "principle of quasi-contract is not applicable to agreements deliberately entered into by the parties however harsh the provisions of such contracts may seem in the light of subsequent happenings"). Since PCC's unjust enrichment counterclaims are not distinguished from those asserted by Scott, they will be dismissed for the same reason.[28] ECF No. 333 ¶¶ 219-25.

Batesville's unjust enrichment counterclaims rest on a different premise. ECF No. 236 ¶¶ 92-96. No contractual relationship existed between Matthews, York Group, Milso and Batesville. The precise basis for Batesville's unjust enrichment claims, however, cannot be readily ascertained. In its responsive brief, Batesville argues that its unjust enrichment claims are based on the alleged misappropriation of "confidential information and customer relationships" procured by Brooks. ECF No. 512 at 23. Matthews, York Group and Milso correctly point out that Batesville's unjust enrichment counterclaims are clearly *not* grounded in Brooks' conduct. ECF No. 558 at 17 n.12. The averments supporting those counterclaims do not incorporate the factual allegations pertaining to Brooks, which appear in a subsequent count

---

[28] PCC's unjust enrichment claims are somewhat convoluted because they are pled as alternatives to breach-of-contract claims that do not exist. ECF No. 333 ¶ 225. PCC has no breach-of-contract claims stemming from Scott's employment agreement. *Id.* ¶¶ 165-74. In their brief in opposition to the pending motion for summary judgment, Scott, Harry and PCC raise a litany of arguments about how Matthews, York Group and Milso were "unjustly enriched" by actions taken in connection with this litigation. ECF No. 522 at 39-44. As noted earlier, however, a party cannot amend his or her complaint "through argument in a brief opposing summary judgment." *Nykiel v. Borough of Sharpsburg*, 778 F.Supp.2d 573, 587 (W.D.Pa. 2011). Since the unjust enrichment counterclaims are clearly pled as alternatives to the breach-of-contract counterclaims, Scott, Harry and PCC cannot articulate new theories in an attempt to forestall summary judgment.

premised on a theory of "unfair competition." ECF No. 236 ¶¶ 92, 97-113. Batesville cannot effectuate an amendment to its complaint through argument. *Nykiel*, 778 F.Supp.2d at 587. The motions for summary judgment filed by Matthews, York Group and Milso will be granted with respect to all counterclaims based on a theory of unjust enrichment. ECF No. 236 ¶¶ 92-96; ECF No. 333 ¶¶ 219-32. For the reasons discussed earlier, Batesville can proceed with its "unfair competition" claims based on the improper actions allegedly taken by Brooks. ECF No. 236 ¶¶ 97-113.

### P. The Remaining Unfair Competition Counterclaims

Scott, Harry and PCC assert various counterclaims grounded in theories of unfair competition. ECF No. 333 ¶¶ 233-43. Based on their briefing, they appear to premise these counterclaims on Pennsylvania law. ECF No. 522 at 36. Matthews, York Group and Milso move for summary judgment with respect to the unfair competition counterclaims. ECF No. 467.

The common law of Pennsylvania incorporates torts relating to unfair competition. *Pennsylvania State Univ. v. Univ. Orthopedics*, 706 A.2d 863, 870-71 (Pa.Super.Ct. 1998). Pennsylvania courts generally follow the Restatement (Third) of Unfair Competition in determining the applicable rules. *Giordano v. Claudio*, 714 F.Supp.2d 508, 521 (E.D.Pa. 2010). The viability of the unfair competition counterclaims will be considered in relation to the principles found in the Restatement.

Scott, Harry and PCC purport to base some of their unfair competition claims on the alleged "copying" of Batesville's products, prices, and marketing strategy. ECF No. 522 at 37. Under the present circumstances, however, they lack prudential standing to assert the rights of Batesville. *Twp. of Lyndhurst v. Priceline.com, Inc.*, 657 F.3d 148, 154 (3d Cir. 2011). A party

ordinarily cannot rest his or her claim to relief on the legal rights or interests of others.  *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 955 (1984).  There is nothing which hinders Batesville's ability to assert its own interests in this litigation.  *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004).  To the extent that the unfair competition counterclaims brought by Scott, Harry and PCC are premised on the alleged misappropriation of Batesville's confidential information, they will be dismissed.

Section 46 of the Restatement imposes liability on "[o]ne who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for purposes of trade . . . ."  Restatement (Third) of Unfair Competition § 46.  Harry's unfair competition claims are partially based on the alleged misappropriation of his name, image and likeness.  ECF No. 333 ¶ 241.  For the reasons discussed earlier, Harry can proceed with his misappropriation claims based on conduct occurring in New York and New Jersey.  ECF No. 333 ¶¶ 244-57.  It does not follow that he can assert parallel claims under Pennsylvania law based on the *same* conduct.  Pennsylvania treats the "appropriation of [an]other's name or likeness" as a tort grounded in a theory of "invasion of privacy."  *Burger v. Blair Med. Assocs., Inc.*, 964 A.2d 374, 376 (Pa. 2009).  The court already concluded that Pennsylvania would not apply its substantive law of privacy to claims based on torts occurring in other jurisdictions.  Restatement (Second) of Conflict of Laws § 152.  To the extent that Harry bases his claims on the alleged distribution of his image to customers in various jurisdictions, the relevant choice-of-law rules would apply the law applicable in his state of domicile.  Restatement (Second) of Conflict of Laws § 153.  He already has viable statutory claims arising under the law of New York.  ECF No. 333 ¶¶ 244-57.  Consequently, the unfair competition

counterclaims will be dismissed insofar as they are premised on a theory of misappropriation.[29]
*Id.* ¶ 241.

Harry contends that Matthews, York Group and Milso engaged in a form of "unfair competition" by interfering with his employment prospects with Carriage Services. ECF No. 522 at 39. Nevertheless, his tortious interference claim stemming from that prospective engagement is specifically premised on the idea that Carriage Services was Matthews' *customer* rather than its *competitor*. ECF No. 522 at 34. After his 2010 retirement, Harry was subject to a three-year non-competition provision. ECF No. 4802 at 13. Given that Harry was not seeking to *compete* with Matthews, York Group or Milso, he cannot reasonably characterize Bartolacci's statements to Payne as an actionable form of "unfair competition."

Matthews, York Group and Milso filed their amended complaint on February 28, 2011. ECF No. 70. Scott, Harry and PCC argue that the amended complaint improperly details "confidential" information procured during the course of prior discovery. ECF No. 522 at 38. A comment to § 1 of the Restatement advises that "[a] competitor who diverts business from another . . . through the wrongful use of confidential information . . . may in some circumstances be subject to liability for unfair competition even if the conduct is not specifically actionable under the rules relating to deceptive marketing or the appropriation of trade secrets." Restatement (Third) of Unfair Competition § 1, comment g. Relying on this language, Scott, Harry and PCC seek to hold Matthews, York Group and Milso liable for the contents of the amended complaint. ECF No. 522 at 38. No authority is cited for the proposition that this nebulous, flexible theory of "unfair competition" can be stretched far enough to hold a party

---

[29] Scott and Harry assail Matthews, York Group and Milso for "misusing" their family name. ECF No. 522 at 37. This contention makes no sense. It is undisputed that several members of the Pontone family remain employed by Matthews. Furthermore, the court already concluded that the "Pontone" name has not acquired the status of a trade name. ECF No. 141 at 8.

liable for information contained in a pleading. The common law of Pennsylvania "accords an absolute privilege of immunity to statements, whether defamatory or not, [contained in] pleadings and other papers filed in regular judicial proceedings." *Preiser v. Rosenzweig*, 646 A.2d 1166, 1167 (Pa. 1994). It is doubtful that the Pennsylvania Supreme Court would recognize an exception to this specific, well-established privilege based on generalized theories of fair play. Assuming *arguendo* that such a cause of action would be recognized, Scott, Harry and PCC do not explain how they have lost business *because* "confidential information" was disclosed in the amended complaint. ECF No. 522 at 38. Hence, their unfair competition counterclaims cannot proceed on such a theory.

Scott and PCC allege that Matthews, York Group and Milso have engaged in unfair competition "by entering into contracts in restraint of trade with customers." ECF No. 333 ¶¶ 235. The documentary record confirms that Matthews executed contracts with several funeral homes requiring that certain products be purchased exclusively from Matthews for specified periods of time. ECF Nos. 549-63 & 549-65. Internal emails suggest that Matthews' purpose for entering into exclusive sales agreements was to "lock in" its customers and prevent their business from being pursued by Batesville and other competitors.[30] ECF No. 549-49 at 1. Scott and PCC maintain that the execution of these contracts constituted unfair competition "in restraint of trade." ECF No. 333 ¶ 235.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, in restraint of trade or commerce among the several States, or with foreign nations . . . ." 51 U.S.C. § 1. Judicial decisions interpreting this statutory provision can be used to inform the inquiry about whether an alleged "restraint of trade" constitutes a form of "unfair competition" under the common law. *State Oil Co. v. Khan*, 522 U.S. 3, 20-21

---

[30] It is worth noting that Batesville appears to utilize exclusive sales agreements as well. ECF No. 466-8 at 4.

(1997)(explaining that the Sherman Act's use of the phrase "restraint of trade" was designed to incorporate principles applicable under the common law).  Under the "rule of reason" applicable to claims arising under the Sherman Act, an "exclusive dealing arrangement" is deemed to be unlawful only if its "probable effect" is to "substantially lessen competition in the relevant market," rather than merely to "disadvantage rivals."  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012).  An illegal "restraint of trade" exists only if "the competition foreclosed by the contract . . . constitute[s] a substantial share of the relevant market."  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961)(applying the Clayton Act).  "Exclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present."  *ZF Meritor*, 696 F.3d at 284.  In this vein, an unfair competition claim cannot be grounded solely on the fact that a competitor enters into exclusive purchasing arrangements with certain customers.  Since Scott and PCC do not point to evidence which suggests that the competition foreclosed by Matthews' exclusive sales contracts constituted a "substantial share of the relevant market," their counterclaims based on Matthews' alleged anticompetitive conduct must be dismissed.  *Tampa Elec. Co.*, 365 U.S. at 328.  Accordingly, the motion for summary judgment filed by Matthews, York Group and Milso will be granted with respect to all counterclaims asserted by Scott, Harry and PCC under common-law theories of "unfair competition."  ECF No. 333 ¶¶ 233-43.

### Q.  The Motion for Leave to File Amended Counterclaims

Scott, Harry and PCC originally asserted counterclaims for abuse of process.  ECF No. 333 ¶¶ 267-78.  On November 30, 2012, Matthews, York Group and Milso moved for a judgment on the pleadings in relation to the abuse of process counterclaims.  ECF No. 390.  That motion was granted in a memorandum opinion and order dated May 22, 2013.  ECF No. 579.

The counterclaims were dismissed without prejudice.  *Id.* at 26.  Scott, Harry and PCC now seek leave to file amended counterclaims for abuse of process.  ECF No. 589.  The motion for leave to amend is opposed by Matthews, York Group and Milso.  ECF No. 591.

Scott, Harry and PCC do not provide a verbatim copy of their proposed amended counterclaims.  ECF No. 589.  Nonetheless, they supplemented their motion with a document detailing in a lengthy and rambling fashion the "substance" of the supplemental allegations that would be contained within their abuse of process averments.  ECF No. 600-1 at 1.  A court does not abuse its discretion in denying a motion for leave to amend that is unaccompanied by the pleading that the complaining party wishes to file.  *Ranke v. Sanofi-Synthelabo, Inc.*, 436 F.3d 197, 205-206 (3d Cir. 2006).  The court, however, is not absolutely forbidden to grant leave to amend in the absence of a proposed pleading.  *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252-53 (3d Cir. 2007)(contrasting situations in which leave to amend may be denied with situations in which leave to amend must be granted *sua sponte*).

Scott, Harry and PCC contend that Matthews, the York Group and Milso were not required to seek leave to amend in order to file their amended complaint.  ECF No. 600 at 1-2.  Alluding to this alleged history of the case, Scott, Harry and PCC maintain that the "burden of persuasion" that they should be required to carry to obtain leave to amend "should be minimal." *Id.* at 2.  A careful review of the documentary record reveals that Matthews, the York Group and Milso were only given twenty days to file their amended complaint without seeking leave to amend.  ECF No. 59 at 45.  Leave was orally granted because the substance of the forthcoming allegations had already been discussed at a hearing concerning a pending motion to dismiss.[31] *Id.* at 42-43.  Each party seeking leave to amend has been required to provide some explanation about what its amended pleading would allege.  Therefore, the court has not "imposed a burden"

---

[31] The deadline was extended at a subsequent hearing.  ECF No. 72 at 27.

on Scott, Harry and PCC that it "elected not to impose" on Matthews, the York Group and Milso at an earlier stage in this case.  ECF No. 600 at 1-2.

The court has already declared that any abuse of process counterclaims based on the "initiation and continuation" of this case are unripe.  ECF No. 579 at 19.  Scott, Harry and PCC will not be granted leave at this time to replead claims of that nature because the litigation is ongoing.  The overall gist of the extensive and numerous supplemental allegations implicates that what Scott, Harry and PCC are complaining about is the entirety of the litigation.  The prior abuse of process claims were dismissed as premature because they raised issues with respect to the initiation and continuation of the litigation.  Nonetheless, Pennsylvania recognizes a cause of action for abuse of process in circumstances "where a legal process is pursued in a perverted manner in order to directly harm an adversary."  *General Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 306 (3d Cir. 2003).  Scott, Harry and PCC will be granted leave to file amended counterclaims for abuse of process but only to the extent that such claims are based on specific factual allegations linked to an identified kind of process asserted to have been abused. The amended counterclaims cannot be based on broad allegations and conclusions implicating the "initiation and continuation" of the instant case.

The amended counterclaims for abuse of process should be set forth in a supplemental pleading.  ECF No. 600 at 10; ECF No. 600-3.  Scott, Harry and PCC will not be permitted to replead counterclaims already considered for purposes of summary judgment.  In accordance with the court's prior admonition, the forthcoming abuse of process counterclaims will be severed from the other claims in this case pursuant to Federal Rule of Civil Procedure 42(b). ECF No. 579 at 26-27 n.7.  At the present time, the court expresses no opinions concerning the viability of the proposed counterclaims for abuse of process.

## VI.    Conclusion

The motion for partial summary judgment filed by Scott and Harry (*ECF No. 473*) and the motion for summary judgment filed by Batesville (*ECF No. 462*) will be denied.  The remaining three motions for summary judgment (*ECF Nos. 463, 467 & 472*) will be granted in part and denied in part.  Among the claims asserted in the amended complaint (*ECF No. 70*), the court will dismiss the breach of fiduciary duty claim against Harry (¶¶ *151-57*), the unfair competition claims against Scott, Harry and PCC (¶¶ *185-90*), and the unjust enrichment claims against Scott and PCC (¶¶ *191-96*).[32]  Batesville's counterclaims for unjust enrichment (*ECF No. 236 ¶¶ 92-96*) will likewise be dismissed.  Among the amended counterclaims asserted by Scott, Harry and PCC (*ECF No. 333*), the court will dismiss Harry's breach-of-contract claim (¶¶ *175-85*), the claims premised on alleged breaches of the implied covenant of good faith and fair dealing (¶¶ *186-202*), the unjust enrichment claims (¶¶ *219-32*), the unfair competition claims (¶¶ *233-43*), the defamation claims (¶¶ *258-66*), the claims based on a theory of "intrusion on seclusion" (¶¶ *279-92*), and the false advertising claims (¶¶ *293-99*).  The pending motions for summary judgment will be denied with respect to all other claims remaining in the case.  Subject to limitations noted above with respect to premature claims, Scott, Harry and PCC will be granted leave to file new counterclaims for abuse of process.  Any such abuse of process counterclaims must be filed "as a separate and supplemental pleading."  ECF No. 600-3.  An appropriate order will be entered.

By the court:

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
Chief United States District Judge

Dated:  March 6, 2014

---

[32] The unfair competition and unjust enrichment claims remain viable with respect to Batesville.